THE STATE OF WASHINGTON, *Respondent,* v. LOREN W.
HANCOCK, *Appellant.*

*Mark W. Muenster* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Dean S. Lum, Deputy,* for respondent.

PEKELIS, J.—Loren W. Hancock appeals his conviction for one count of indecent liberties, one count of first degree incest, and one count of third degree statutory rape. He contends that the trial court erred (1) in finding the out–of–court statements of one of the victims admissible under RCW 9A.44.120, (2) in interpreting RCW 9A.44.120 to permit the victim's mother to testify about a statement made by Hancock to the victim, (3) in refusing to admit certain evidence pertaining to previous sexual abuse of the victim by one other than Hancock, (4) in admitting evidence of Hancock's gun ownership, and (5) in allowing the State to call Hancock's wife for the sole purpose of impeaching her. We affirm the trial court.

## FACTS

Hancock was charged by information with committing indecent liberties on his nephew, "B", and incest and statutory rape on his son, "L". At the time the offenses were allegedly committed, B was between 3 and 7 years of age, while L was between 14 and 16. At the time of trial, B and L were, respectively, 8 and 16 years of age.

Before trial, the court held a hearing to determine whether certain out–of–court statements made by B to his mother would be admissible under RCW 9A.44.120, the

child hearsay exception statute. At the hearing, B's mother testified that in September 1984, with her son present, she had a heated argument with Hancock. The next day, B was behaving violently and defiantly, acting out his uncle's role in the previous day's argument. Although she initially reacted by spanking him, she later read the Bible to him, and he eventually calmed down. She then asked him what was wrong, and he responded, "Uncle Loren messed with my private parts." B's mother also testified that on the way to discuss the incident with a detective, B told her, "Uncle Loren messed with [L], too." B explained to her that when Hancock put his hand in B's shorts, he asked B whether he liked it, and when B said he didn't know, his uncle stated, "Well, my son does."

The court found sufficient indicia of reliability in the content and circumstances of the two statements made by B to his mother, and ruled that they were admissible under RCW 9A.44.120. Accordingly, B's mother was allowed to testify at trial as to both statements. Additionally, she testified that just before B made the first statement, when he was acting out the role of his uncle, she told him that she had heard that Hancock had "done things wrong with his own boys."[1]

B testified at trial in a manner generally consistent with his mother's testimony. He also related that another person, one Rocky Gibbons, had "done bad things" to him. On cross examination, defense counsel asked B what Rocky made him do. The prosecutor's objection on the grounds of relevancy was sustained.

L testified about two occasions on which he was sexually abused by Hancock. These occurred, according to L, when he was 13 or 14 years old. He explained that he did not tell the police at that time because he was afraid of what his father might do. At this point, the prosecutor asked, over defense counsel's objection, whether Hancock owned a gun.

[1]This had not been a part of her testimony at the earlier hearing to determine the admissibility of B's statement to her under RCW 9A.44.120.

L answered that he did.

Roberta Hancock, the defendant's wife, was called to testify by the prosecution. She was asked whether she suspected that her husband had done anything improper with B. When she replied in the negative, she was asked whether she had told the investigating officer, Detective Ostrander, that she suspected something. She stated that she did not remember Detective Ostrander. In response to further questions, she denied that Hancock had admitted doing anything improper with L, denied that Hancock had threatened her, and denied that she was afraid of him. After each denial, she was asked whether she had ever made contrary statements to Detective Ostrander. She replied that she did not remember making such statements.

Detective Ostrander was then called by the prosecution. Over defense counsel's objection, he testified to certain out-of-court statements made to him by Roberta Hancock. According to Ostrander, Roberta Hancock told him that she had suspected something was going on between B and her husband, that Hancock had told her what he had done to L, and that she was afraid of him.

Hancock testified in his own defense, denying the charges against him. He explained that B had a problem with bed-wetting, and that on one occasion when he was sleeping with B, he awakened and felt the front of B's shorts to see if they were wet. He surmised that B had confused this incident with the one involving Rocky Gibbons. He attributed B's mother's testimony, as well as L's, to personal animosity.

### ADMISSIBILITY OF TESTIMONY UNDER RCW 9A.44.120

RCW 9A.44.120[2] permits the use of an otherwise

---

[2]RCW 9A.44.120 provides in pertinent part:

"A statement made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, not otherwise admissible by statute or court rule, is admissible in evidence in dependency proceedings under Title 13 RCW and criminal proceedings in the courts of the state of Washington if:

"(1) The court finds, in a hearing conducted outside the presence of the jury,

inadmissible statement by a victim of sexual abuse under the age of 10 when the court finds that the circumstances of the statement provide sufficient indicia of reliability. The determination of whether a statement is admissible under RCW 9A.44.120 is within the sound discretion of the trial court. *State v. Frey,* 43 Wn. App. 605, 611, 718 P.2d 846 (1986). In *State v. Ryan,* 103 Wn.2d 165, 691 P.2d 197 (1984), the Supreme Court outlined some of the factors to be considered in determining the reliability of an out–of–court statement under RCW 9A.44.120. These are: (1) whether the declarant had a motive to lie, (2) the character of the declarant, (3) whether more than one person heard the statement, (4) whether the statement was made spontaneously, and (5) the timing of the statement and the relationship between the declarant and the witness. *Ryan,* at 175–76.[3]

The *Ryan* court applied these considerations to the facts before it, and found that the statements in question were not sufficiently reliable to be admissible under RCW 9A.44.120. *Ryan,* at 176. First, the children in that case had a motive to lie, since their stories explained the source of candy which they knew they were not supposed to have. *Ryan,* at 176. In addition, the children did not make their statements spontaneously, but in response to questioning by their mothers. *Ryan,* at 176. Finally, at the time of the

---

that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and

"(2) The child either:

"(a) Testifies at the proceedings; or

"(b) Is unavailable as a witness: *Provided,* That when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act."

[3]These factors are not exclusive, and should be considered with the additional factors in *Dutton v. Evans,* 400 U.S. 74, 88–89, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970): (1) whether the statement contains an express assertion about past fact, (2) whether cross examination could show the declarant's lack of knowledge, (3) the probability that the declarant's recollection is faulty, and (4) whether the circumstances surrounding the statement are such that there is reason to suppose the declarant misrepresented the defendant's involvement. *Ryan,* at 176.

questioning, the mothers had already been told that the defendant might have committed indecent liberties on their children, so they were predisposed to confirm what they had been told. *Ryan,* at 176.

The circumstances surrounding the out–of–court statements in this case are quite different from those which were present in *Ryan.* First, there was no apparent motive for B to lie. Further, although B's first statement was elicited by his mother's questioning, it does not appear that this questioning was directed to the topic of sexual abuse. His second statement was apparently spontaneous. Finally, the record does not clearly reflect whether B's mother was predisposed to believe stories of sexual abuse about Hancock,[4] although it is clear that there was some ill will between them. On these facts, we cannot say that the trial court abused its discretion in finding that B's statements were sufficiently reliable to be admitted under RCW 9A.44.120.[5]

Independent of the reliability issue, Hancock contends that the trial court erred in allowing B's mother to testify as to B's statement that Hancock told him, "My son likes it."[6] Hancock characterizes this statement as "hearsay within hearsay", and argues that it does not conform to the admissibility requirements of ER 805 because the "first level" of hearsay, that of B's statement to his mother, was not admissible under RCW 9A.44.120.[7]

---

[4]Her statement to B that she had heard that Hancock had "done things wrong with his own boys" is ambiguous. Neither counsel explored this further.

[5]We note that since B testified at trial, there is no need for corroborative evidence of the act. *See* RCW 9A.44.120(2).

[6]The trial court apparently found that B's statement was admissible under RCW 9A.44.120 because there were "sufficient indicia of reliability."

[7]ER 805 provides:
    Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.
We recognize that the statement in question cannot technically be hearsay within hearsay since Hancock's statement to B is an admission by a party oppo-

The statute creates an exception to the hearsay rule, but limits that exception to "[a] statement made by a child when under the age of ten describing any act of sexual contact performed *with or on the child* by another". (Italics ours.) RCW 9A.44.120. B's statement did not describe an act of sexual contact performed *with or on B*; rather, it refers to an act performed on L. Thus, it does not fall within the purview of RCW 9A.44.120, and its admission was error.

We must next determine whether it was harmless error. In some cases, a violation of RCW 9A.44.120 will also be a violation of the right of confrontation guaranteed by U.S. Const. amend. 6 and Const. art. 1, § 22 (amend. 10). *See Frey*, at 609–10 (corroboration requirement of RCW 9A.44-.120(2)(b) is nonconstitutional, while requirement that statements have sufficient indicia of reliability is constitutional). In the case of a constitutional violation, the more stringent standard of proving "harmless error beyond a reasonable doubt" is applicable. *See State v. Jackson*, 42 Wn. App. 393, 398, 711 P.2d 1086 (1985).

Here, however, the error was nonconstitutional. The general approach used to test hearsay admissions against confrontation rights requires (1) either the production of the out-of-court declarant or a demonstration of his unavailability, and (2) assurances of the statement's reliability. *Ryan*, at 170. In this case the out-of-court declarant, B, was produced, and his statement was properly found to be reliable. Therefore, the admission of B's statement through his mother's testimony did not violate Hancock's constitutional right of confrontation.

Since the admission of B's statement was a statutory, not a constitutional violation, it was harmless unless, "within reasonable probabilities, had the error not

nent, and therefore not hearsay by definition. *See* ER 801(d)(2)(i). Although there is thus only one level of hearsay, that of B's statement to his mother, we find that defense counsel's objection and comments were sufficient to advise the trial court of the nature of his objection and that the issue is preserved for our review.

occurred, the outcome of the trial would have been materially affected." *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). In this case, the same evidence was properly before the jury since B testified himself as to what Hancock told him.[8] The testimony of B's mother on this issue is essentially a repetition of B's own testimony, and adds little or nothing. We find, therefore, that the error was harmless.

## PREVIOUS SEXUAL ABUSE

Hancock next assigns error to the court's ruling restricting defense counsel's cross examination of B on the issue of previous sexual abuse by Rocky Gibbons. He argues that the evidence counsel sought to elicit was relevant to show that there was another possible origin for B's story, and that the incident involving Rocky Gibbons had become merged in B's mind with the bed–wetting incident.

In order to be admissible, evidence of prior sexual abuse must, of course, be relevant. *See State v. Carver*, 37 Wn. App. 122, 124–25, 678 P.2d 842 (1984); *State v. Peterson*, 35 Wn. App. 481, 484, 667 P.2d 645 (1983). The determination of the relevancy of evidence lies within the discretion of the trial court. *State v. Jordan*, 39 Wn. App. 530, 539, 694 P.2d 47 (1985). Evidence of prior sexual abuse may be relevant to show, among other things, a motive for fabrication, *Peterson*, at 484, or to rebut the inference that the victim would not have knowledge of sexual acts and terminology unless the defendant were guilty as charged, *Carver*, at 124. In *Carver*, the court found that the complete exclusion of such evidence was reversible error because it unfairly curtailed the defendant's ability to explain the victim's testimony. *Carver*, at 124–25.

In this case, unlike *Carver*, the exclusion of evidence was far from complete. It was apparently conceded that defense counsel's general line of inquiry into prior sexual abuse was relevant and admissible. The prosecution objected to, and

---

[8]Hancock's statement, as testified to by B, is not hearsay since, as we have already observed, it is an admission by a party opponent. *See* ER 801(d)(2)(i).

the court excluded, only the details of what Rocky Gibbons made B do. Defense counsel was permitted to elicit the testimony that it was the same type of conduct that Hancock had allegedly engaged in, and counsel was free to develop, without objection, the theory that B had confused the two incidents.[9] On these facts, we cannot say that the trial court abused its discretion when it determined that the particular details of Rocky Gibbons' conduct were not relevant.

### EVIDENCE OF DEFENDANT'S GUN OWNERSHIP

Next Hancock contends that it was error for the trial court to admit evidence of his gun ownership. He argues that such evidence was irrelevant and prejudicial, and that it impermissibly penalized his constitutionally protected right to bear arms. The prosecution argues that the evi-

---

[9]The entire colloquy went as follows:
"Q The situation with Rocky, when Rocky was touching you—
"A He didn't touch me.
"Q Rocky made you do something like this, though, right?
"A Yeah.
"Q What did he make you do?
"A Do I have to tell them?
"Q Well,—
            "MR. LUM: Objection, your Honor. I don't think it's relevant.
            "THE COURT: Sustained.
"Q (By Mr. Hough) Okay. It was bad, though?
"A (Nods head).
"Q And kind of the same thing that we're talking about?
"A (Nods head), sort of.
"Q Okay. When did that happen?
"A When I was little.
"Q Somewhere between one and five years ago?
"A I think so.
"Q Do you remember which one of these things happened first?
"A The one with Rocky.
"Q Are you sure about that?
"A I think so.
"Q Could it have been the other way around?
"A Probably.
"Q Basically, you don't really know, do you?
"A (Shakes head.)
            "THE COURT: You have to answer out loud.
"A No, I don't."

dence was relevant to L's fear of Hancock, and thus to L's failure to promptly report his sexual abuse.

A review of the record reveals no connection between L's fear and his father's gun ownership.[10] Although defense counsel's relevancy objection was overruled, the prosecuting attorney did not pursue this line of questioning, and made no attempt to connect the gun with L's "subconscious fear." Thus, the evidence of Hancock's gun ownership appears to be gratuitous and irrelevant.

■ ■ Moreover, the challenged evidence implicates Hancock's right to bear arms. *See State v. Rupe,* 101 Wn.2d 664, 706, 683 P.2d 571 (1984). Const. art. 1, § 24 provides:

> The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men.

There was no evidence that Hancock's possession of a gun was other than lawful. Thus, as stated in *Rupe,* at 707:

> [he was] entitled under our constitution to possess weapons, without incurring the risk that the State would subsequently use the mere fact of possession against him in a criminal trial unrelated to their use.

Because the impermissible use of constitutionally protected behavior violates due process, *Rupe,* at 706 (citing

---

[10]L's testimony pertaining to his father's gun was as follows:

"Q Did you call the police about that right afterwards?

"A No.

"Q How come you didn't call the police?

"A Told not to tell anybody; maybe subconscious fear.

"Q Why would you have feared him?

"A Because I don't know what he might've done.

"Q Does your father have a gun?

　　　　"MR. HOUGH: I'll object, your Honor.

　　　　"THE COURT: Grounds?

　　　　"MR. HOUGH: Relevance.

　　　　"THE COURT: Overruled.

"Q (By Mr. Lum) Does your father have a gun?

"A Yeah, he does."

*Zant v. Stephens,* 462 U.S. 862, 885, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983)), the admission of Hancock's gun ownership was an error of constitutional magnitude. Consequently, it cannot be deemed harmless error unless the properly admitted, or "untainted," evidence is "so overwhelming that it necessarily leads to a finding of guilt." *State v. Guloy,* 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), *cert. denied,* 106 S. Ct. 1208 (1986).[11]

We find that the admission of Hancock's gun ownership was harmless error. Given the overwhelming evidence of Hancock's guilt, which included the direct testimony of the 16–year–old victim, as well as Hancock's own admission of improper sexual contact, we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. *See Guloy,* at 425.

### IMPEACHMENT—ER 607

Finally, Hancock asserts that the testimony of Detective Ostrander as to the statements made to him by Roberta Hancock was inadmissible hearsay. He argues that the testimony was not admissible under ER 607 to impeach Roberta Hancock's credibility because she was improperly called by the prosecution. He contends that the prosecution knew that her testimony would be unfavorable to its case, and that it called her only to elicit testimony which could

---

[11]We recognize that our analysis appears to depart at this point from that of the Supreme Court in *Rupe.* In that case, the court did not explicitly consider whether the impermissible use of constitutionally protected behavior could be harmless error, but simply stated that "if the evidence in question allowed the jury to draw adverse inferences from a constitutional right, reversal of defendant's death sentence is required." *Rupe,* at 706.

However, we do not interpret *Rupe* as standing for the proposition that *any* impermissible use of constitutionally protected behavior is necessarily reversible error. In *Rupe,* evidence of the defendant's gun ownership was "the crux of the prosecutor's argument to the jury for defendant's death." *Rupe,* at 708. Consequently, the court rejected the State's contention that no prejudice resulted from its admission. *Rupe,* at 708. In contrast, in the case sub judice the reference to Hancock's gun ownership was merely an unsuccessful attempt to account for L's delay in reporting the abuse. There was no argument, express or implied, that gun ownership was related to the ultimate issue of guilt.

subsequently be used to impeach her.

ER 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him." However, in *State v. Lavaris,* 106 Wn.2d 340, 721 P.2d 515 (1986), decided after the trial in this case, the Supreme Court adopted the analysis of *State v. Barber,* 38 Wn. App. 758, 689 P.2d 1099 (1984), *review denied,* 103 Wn.2d 1013 (1985), which held that "[a]lthough the State may impeach its own witness, it may not call a witness for the primary purpose of eliciting testimony in order to impeach the witness with testimony that would be otherwise inadmissible." *Lavaris,* at 345 (quoting *Barber,* at 770). In *Lavaris,* the court nevertheless affirmed the defendant's conviction because it found that impeachment was not the State's *primary purpose* in calling the witness. *Lavaris,* at 346.

In the case before us, the record demonstrates that in his direct examination of Roberta Hancock, the prosecutor attempted to elicit matters that were probative, proper, and admissible. Before confronting her with her prior inconsistent statements, he asked appropriate leading questions directed to whether she had suspected her husband of engaging in improper conduct with B, whether he had ever told her what he had done with L, whether he had threatened her, and whether she was afraid of him. Each of these questions was apparently consistent with information provided to the prosecution by Detective Ostrander. Nothing in the record indicates that there was reason to anticipate that she would not testify consistently with her earlier statements.[12] Only after she answered in the negative to these questions did the prosecutor draw attention to her earlier inconsistent statements.

---

[12]Hancock argues that since his trial counsel indicated on the record that Hancock would not invoke the marital privilege, the prosecutor was on notice that the wife's testimony would not be favorable to the State. The record shows, however, that the prosecutor advised the court that the marital privilege does not apply in cases involving abuse of a child of either spouse, and thus was not available to the defendant. *See* RCW 5.60.060(1).

Based on the foregoing, we cannot say that the State's primary purpose in calling Roberta Hancock was to later impeach her with Detective Ostrander's otherwise inadmissible testimony. Therefore, the detective's testimony was admissible under ER 607.

Affirmed.

WILLIAMS and WEBSTER, JJ., concur.

Reconsideration denied March 10, 1987.

Review granted by Supreme Court July 1, 1987.

[No. 18602-7-I.   Division One.   January 27, 1987.]