[Nos. 18661-2-I; 19542-5-I.   Division One.   October 19, 1987.]

ALAN FETTIG, ET AL, *Respondents,* v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Appellant.*

*Kenneth O. Eikenberry, Attorney General,* and *Michael T. Mitchell, Assistant,* for appellant.

*Charles E. Hunter,* for respondents.

WEBSTER, J.—Appellant Department of Social and Health Services (DSHS) placed respondent Alan Fettig's name on the central registry of child abuse[1] and revoked his day-care license. The DSHS decision was upheld by an administrative law judge, and Fettig requested judicial review. DSHS appeals from a decision of the superior court reversing and remanding the case for further administrative proceedings. DSHS raises issues involving the admissibility of hearsay evidence and expert testimony and the striking of a condition for Fettig's retention of his day-care license. The Fettigs cross-appeal, requesting this court to affirm the reversal, but to strike the order to remand. We reverse the trial court on all issues except one, thereby upholding the decision of the administrative law judge.

## FACTS
### A
### Procedural History

In August 1984 DSHS notified Alan and Betty Fettig that it had placed Alan's name on the child abuse register and that it intended to revoke their license to operate their child care center because of Alan's alleged sexual abuse of CR,[2] age 4. The license was then revoked. DSHS later amended the grounds for revocation of the license to include consideration of Alan's mental condition. The Fettigs requested and received a hearing in which the administrative law judge affirmed the decision of DSHS. DSHS issued a review decision affirming the initial decision.

The Fettigs then requested review by the superior court, which reversed the initial decision of the administrative law

---

[1]The central registry of child abuse is maintained by the Department of Social and Health Services pursuant to RCW 26.44.070.

[2]To protect the child's anonymity only her initials are used.

judge and remanded the case for a new hearing on all the issues. The Fettigs moved for reconsideration, requesting the court to strike the remand provision and to require certain procedural changes in the event the remand was upheld. In June 1986 DSHS filed a notice of appeal. Subsequent motions for reconsideration by the Fettigs were denied by the superior court. In November 1986 the Fettigs filed a notice of appeal. The two appeals were then consolidated on review.

## B
### Substantive Facts

The administrative hearing was held on November 30, 1984, and on December 3 and 4, 1984. The following testimony relating to alleged sexual abuse of CR by Alan Fettig was presented:

CR's mother testified that CR attended the Fettigs' day-care center from August 1982 until May 1984 except for time off during vacations and the summer months. At first CR was excited about going to day care and did not want to leave when her mother came to pick her up. However, around January 1984, CR exhibited some disturbing behaviors: kicking and hitting her mother after day care, pulling her panties down at a family gathering, putting objects near her vaginal area, trying to hug and kiss a 12–year–old boy who was visiting the family, and using the terms "beavo" and "wieno." A continuing hearsay objection was noted for the record.

CR's mother then related an incident told to her by CR's grandfather. He said that CR had told her cousin the following things about Alan Fettig: Alan had made CR sit on a rock naked with bugs on it; Alan had taken pictures of her naked; she and Alan put their bottoms together; and Alan made her rub his wienie. When questioned by her mother, CR repeated the same story. CR's aunt testified that the cousin had also confided in her about CR sitting naked on a rock at school.

CR's father testified that around February or March of

1984 CR became belligerent, rude, and sometimes violent with her mother. He related the incident at the family gathering where CR had pulled up her dress and pulled down her panties. She used the words "wiener" and "titties," which were not words used in their household. She also used the word "beaver," which had been used by him and his wife and may have been picked up by CR.

A Children's Protective Services caseworker specializing in sexual abuse testified about two interviews with CR. In the first interview CR said that Alan had touched her "beavo" in his bedroom and that he had asked CR to touch his "wieno." Alan also took her picture while she sat naked on a rock with bugs and slugs. In the second interview, while playing with anatomically correct dolls, CR told the caseworker that Alan had undressed her, that his penis was hard, and that something like pee came out of it. CR then kissed the vaginal area of the girl doll and placed the penis of the male doll in her mouth. The caseworker stated that it was unusual for a child of CR's age to put these body parts in her mouth. CR said that when Alan touched her, he asked her not to tell. He also allowed her to stay up and miss her nap. Above objections the caseworker opined that CR had been sexually molested by Alan Fettig.

A child and family therapist testified that she had been treating CR since August 1984 using nondirective play therapy. A continuing hearsay objection was granted regarding statements made by CR coming in through this witness or any other witnesses. Above objections the therapist then stated her opinion that CR had been sexually abused by Alan Fettig.

The therapist described behaviors exhibited by CR during play therapy such as secretiveness, aggression, control, and anxiety about undressing the dolls. While reading a "birth book", CR told the therapist that Alan Fettig had undressed her while he was also undressed. CR then laid a nude male doll on top of a nude female doll and stated that Alan had lain on top of her and touched her "beaver." CR next took a camera and asked the therapist to pretend that

she was Alan. CR then pointed the camera at her vagina with her legs spread apart. The therapist also noted certain themes in CR's play that often appear in sexually abused children: snakes, death, robbing someone, and the sense of being intruded upon. In her opinion CR's abuse had been nonviolent with a degree of secrecy involved in the name of affection.

The therapist further stated that CR showed positive attitudes toward her parents. Although CR had been taking showers with her father until she began touching his private parts, she felt that CR behaved in an appropriate way with him.

A DSHS day–care licensor who was present at the staff meeting when revocation of the Fettigs' license was discussed also testified. Above objections she stated that she had heard nothing at the hearing to change her mind concerning the license revocation.

CR's pediatrician testified that after the alleged abuse he examined CR's vaginal and anal areas and found no tears or scarring. However, he was disturbed by CR's rubbing her leg against his thigh and surprised by her willingness to expose her vaginal area during the examination. In his opinion, if CR had been molested, the experience had not been a painful one.

Also testifying were eight parents who had children in the Fettigs' day–care center when CR was there. They had questioned their children and were satisfied that Alan Fettig had not abused them. Although they were aware that Alan Fettig had a mental breakdown in February 1984, they did not feel it necessary to remove their children from the day–care center.

Alan Fettig testified that his mental breakdown was brought on by the excitement of moving the day–care center to a new location. He regularly sees a psychiatrist, having never missed an appointment, and now considers his mental health "perfect." He stated that he once gave CR a "swat" when she pulled her pants down in front of the other children. However, he denied having CR touch his

penis, taking nude pictures of CR, or touching CR's vaginal area other than to change her diapers.

Betty Fettig testified that on two occasions she and Alan had caught CR pulling her panties down in front of the other children. The children told the Fettigs that CR had her panties down on other occasions too. CR was also overly aggressive in kissing and touching the other children. The foregoing behaviors were also mentioned by the other parents and Alan Fettig.

A psychologist who works with sexual offenders testified that in November 1984 he did a psychological profile on Alan Fettig in which arousal to various visual and audio sexual stimuli was measured. Alan showed very little arousal to visual stimuli, some arousal to children, and a larger arousal to audio stimuli with consenting adult women. He stated that Alan appears to have no major psychiatric disorder and no predisposition to molesting young children.

A psychiatrist who had treated Alan Fettig since February of 1984 diagnosed him as having bipolar affective disorder in the manic phase. This disorder manifests itself in hyperactivity such as excessive planning and multiple sexual, occupational, political, and religious activities. Another symptom is involvement in activities with a high potential for painful consequences. Alan was being treated with lithium carbonate. In the psychiatrist's opinion Alan is presently in a good state of mental health, is able to care for children, and did not sexually abuse CR.

A polygraph examiner testified that he and his partner ran tests on Alan Fettig in July of 1984. Initially, Alan's responses did not reveal whether he attempted deception about CR touching his bare penis. However, upon retesting, Alan was being truthful when he denied that this touching occurred. He also answered truthfully when he denied ever touching CR's vaginal area other than to change her diaper.

After considering the foregoing testimony, the administrative law judge made findings of fact and conclusions of law affirming the DSHS decision. The superior court

reversed and remanded his decision. DSHS timely appealed asserting (1) that the administrative court had properly admitted hearsay and expert testimony and (2) that the administrative court had correctly conditioned the relicensing of Alan Fettig on his taking medication and submitting monthly mental health reports. On cross appeal the Fettigs dispute the decision of the administrative court and the conditions imposed on relicensing. Our analysis begins with a determination of the appropriate standard for judicial review.

## STANDARD OF REVIEW FOR ADMINISTRATIVE DECISIONS

In *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 323, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983), the court held that judicial review of administrative action is governed under the administrative procedure act RCW Title 34, by RCW 34.04.130(6), which provides:

> The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
> (a) in violation of constitutional provisions; or
> (b) in excess of the statutory authority or jurisdiction of the agency; or
> (c) made upon unlawful procedure; or
> (d) affected by other error of law; or
> (e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or
> (f) arbitrary or capricious.

That review, whether conducted by the superior court, Court of Appeals, or Supreme Court, is limited to the record of the administrative tribunal itself. RCW 34.04-.130(5); *Department of Ecology v. Ballard Elks Lodge 827,* 84 Wn.2d 551, 555, 527 P.2d 1121 (1974). This court applies the same standard to the administrative record as the superior court applied and makes an independent determination. *Shaw v. Department of Empl. Sec.,* 46 Wn. App.

610, 613, 731 P.2d 1121 (1987).

## ADMISSIBILITY OF EVIDENCE IN ADMINISTRATIVE PROCEEDINGS

The hearings judge functions under a more relaxed standard than that required by the rules of evidence. RCW 34.04.100, which provides for the admissibility of evidence in administrative proceedings, reads in pertinent part:

> Contested cases—Rules of evidence—Cross–examination. In contested cases:
> (1) Agencies, or their authorized agents, may admit and give probative effect to evidence which possesses probative value *commonly accepted by reasonably prudent men in the conduct of their affairs.* . . . They may exclude incompetent, irrelevant, immaterial, and unduly repetitious evidence.
>
> . . .
> (3) Every party shall have the right of cross–examination of witnesses who testify, and shall have the right to submit rebuttal evidence.

(Italics ours.) In *Nisqually Delta Ass'n v. DuPont,* 103 Wn.2d 720, 734, 696 P.2d 1222 (1985), the court held that hearsay evidence is admissible at an administrative hearing where it is the "'best evidence reasonably obtainable'".

## ADMISSIBILITY OF CHILD'S HEARSAY STATEMENTS

This case involves the admissibility of a child's hearsay statements regarding sexual abuse. Because no specific rules govern the admissibility of this type of evidence in administrative proceedings, we turn, as a reference point, to the rules governing admissibility of a child's hearsay statements in the criminal context. Nevertheless, we remain mindful of the relaxed standard of RCW 34.04.100.

In the criminal setting a determination of both competency and reliability is necessary when a child's statements concerning sexual abuse are admitted. *State v. John Doe,* 105 Wn.2d 889, 896, 719 P.2d 554 (1986). Competency refers to the personal qualifications of a witness to testify. Black's Law Dictionary 257 (5th ed. 1979). Thus, incompetent witnesses include "[c]hildren under ten years of age,

who appear incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly." Former RCW 5.60.050(2). On the other hand, reliability refers to the time, content, and circumstances of the statement that provide indicia of its trustworthiness. *State v. Ryan,* 103 Wn.2d 165, 174, 691 P.2d 197 (1984). Former RCW 9A.44.120, providing for the admission of a child's hearsay statements in *criminal proceedings* involving sexual abuse, governs reliability.[3] It reads in part:

Admissibility of child's statement—Conditions. A statement made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of the state of Washington if:

(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and

(2) The child either:

(a) Testifies at the proceedings; or

(b) Is unavailable as a witness: *Provided,* That when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

■ Thus, RCW 9A.44.120 permits the use of an otherwise inadmissible statement by a victim of sexual abuse under the age of 10 when the court finds that the circumstances of the statement provide sufficient indicia of reliability. *State v. Hancock,* 46 Wn. App. 672, 675–76, 731 P.2d 1133, *review granted,* 108 Wn.2d 1021 (1987). The trial court's finding that a statement is admissible under RCW 9A.44.120 should not be reversed absent a showing of manifest abuse of discretion. *State v. Frey,* 43 Wn. App. 605, 611, 718 P.2d 846 (1986). In exercising that discretion, the court in *State v. Ryan, supra,* required the trial court to consider nine factors bearing on the reliability of the

---

[3]RCW 9A.44.120 was amended in 1985 to include dependency proceedings under RCW Title 13.

out–of–court statement. The court stated:

> Recently this court adopted a set of factors applicable to determining the reliability of out–of–court declarations. *State v. Parris,* 98 Wn.2d 140, 654 P.2d 77 (1982). Those factors are: "(1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness." *Parris,* at 146. We added that these factors were not exclusive and should be considered with the additional factors in *Dutton v. Evans,* 400 U.S. 74, 88–89, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970): (1) the statement contains no express assertion about past fact, (2) cross examination could not show the declarant's lack of knowledge, (3) the possibility of the declarant's faulty recollection is remote, and (4) the circumstances surrounding the statement (in that case spontaneous and against interest) are such that there is no reason to suppose the declarant misrepresented defendant's involvement.

*Ryan,* at 175–76. These nine factors must be substantially met before a statement is demonstrated to be reliable. *State v. Griffith,* 45 Wn. App. 728, 738–39, 727 P.2d 247 (1986).

In this case the superior court judge ruled that the testimony of the witnesses was inadmissible hearsay. Although he acknowledged the difference in the standards of evidence applicable in administrative and termination proceedings, he, nevertheless, concluded that reliability was lacking and directed the hearings judge on remand to make findings regarding the reliability of CR's statements.

We disagree, concluding that the hearings judge properly assessed the reliability of CR's statements. In conclusions of law 6 and 7 the hearings judge applied the *Ryan* factors as follows:

> 6. In the *Ryan* case, the court discussed to a considerable extent the relationship of hearsay and the admissibility of same in criminal proceedings. In addition to corroboration requirements, reliability in regard to the child's statements must be considered. . . . As outlined

in the [*State v.*] *Parris* [98 Wn.2d 140, 654 P.2d 77 (1982)] case, the court has adopted a set of factors applicable to determine the reliability of out–of–court declarations. Those factors were considered in regard to CR's statements. First of all, the undersigned could determine no apparent motive to lie on the part of the child. The evidence presented in regard to the general character of the child does not show a character that would lead to unreliability in regard to the statements. The child told statements of the same general subject matter to several persons in regard to being abused and that Appellant was the abuser. From time–to–time, the statements were made spontaneously while the child interacted with the witnesses at the hearing. The timing of the declaration and the relationship between the declarant and the witness show that the child apparently trusted each witness and was relating her experiences with Appellant within apparent months of the incident or incidents. Because of additional factors, as stated under the [*Dutton v.*] *Evans* [400 U.S. 74 (1970)] case, the undersigned cannot determine an express assertion about past fact. Additionally, with a three to four–year–old child, cross–examination does not appear to the undersigned that it would show her lack of knowledge. Finally, the possibility of the child's faulty recollection is remote, particularly, since from time–to–time she has been consistent in her statements in general, has knowledge beyond her age including sophisticated words for general anatomy and sexual activity and is able to identify Appellant. Finally, the circumstances surrounding the statement that CR made to each witness at the proceedings were such that there is no reason to suppose CR misrepresented Appellant's involvement.

7. In regard to the corroboration issue, it must be concluded that the incident occurred at some point between September 1982 and May 1984, most probably in late 1983 or early 1984. Family members noticed a change in the child's demeanor, the use of abusive and crude language, acts of vaginal touching and lower body exposure and a general attitude of agression [*sic*] and hostility toward her parents. Since the child's therapy sessions which were designed to be treatment for a child who has been sexually abused, it is clear that there has been an improvement in the child's behavior and attitude which

when coupled with her change of day–care provider, must lead to the conclusion that her assertions have been corroborated for purposes outlined herein.

In conclusion, having considered the criminal rules in light of RCW 34.04.100, we hold that the hearings judge adequately addressed reliability under *State v. Ryan.*

### EXPERT TESTIMONY

The Fettigs object to testimony from the caseworker and the therapist in which they stated that CR had been sexually abused and that Alan Fettig had abused her. Under ER 704 an expert's testimony may embrace an ultimate issue to be decided by the trier of fact. However, the expert may not usurp the fact finder's function by determining the credibility of the witness. *State v. Fitzgerald,* 39 Wn. App. 652, 657, 694 P.2d 1117 (1985); 5A K. Tegland, Wash. Prac., *Evidence* § 293, at 39 (2d ed. 1982). Therefore, to the extent the caseworker and the therapist opined that CR had been sexually abused and that Alan was her abuser, they impermissibly invaded the hearing judge's function to determine witness credibility.

However, CR's references to Alan Fettig made to the therapist in the course of treatment were correctly admitted. ER 803(a)(4) states:

> *Statements for Purposes of Medical Diagnosis or Treatment.* Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

During play therapy CR voluntarily identified Alan Fettig as the person who undressed her, touched her vagina, and took pictures of her vagina. This evidence was sufficient for a rational trier of fact to conclude that CR had been sexually abused and that Alan Fettig had abused her.

### CONDITIONS OF LICENSING

DSHS next challenges the superior court's reversal of conclusion of law 9, which states in pertinent part:

If revocation is not appropriate, [Alan Fettig's] license should be at least restricted so as to ensure the proper taking of medication with provision for monthly reports from mental health sources to ensure such safety.

The court was correct in reversal because no findings support the conclusion that Alan Fettig needs close medical supervision. The absence of a finding on a material issue is presumed to be a negative finding against the party with the burden of proof. *Eggert v. Vincent,* 44 Wn. App. 851, 856, 723 P.2d 527 (1986), *review denied,* 107 Wn.2d 1034 (1987). In fact, the testimony revealed that Alan Fettig keeps appointments with his psychiatrist and is in a good state of mental health.

### Issues on Cross Appeal

The Fettigs claim that the superior court erred by reversing *and* remanding this case for a new hearing rather than simply reversing. Having determined that the superior court decision should be reversed and the administrative courts' decision reinstated, we need not address this issue.

They also make the following assignments of error, which we shall consider briefly. First, they assert that the therapist and the caseworker should not have been permitted to discuss CR's actions and reactions during play therapy. Under *In re Penelope B.,* 104 Wn.2d 643, 655, 709 P.2d 1185 (1985), nonassertive voluntary statements of the alleged victim during play therapy are not hearsay and are admissible. Second, they claim that the day care licensor's testimony was a waste of time. RCW 34.04.100 excludes "unduly repetitious" evidence. Because no other licensor had testified, the admission of this testimony was not error. Third, they assert that DSHS submitted two items of documentary evidence 23 days after the hearing in violation of WAC 388–08–414(1) and (2)(d).[4] Even if error, this error was harmless because there was substantial evidence to substantiate Alan Fettig's involvement with CR without

---

[4]WAC 388–08–414 was repealed by State Register 84–05–040 (order 2076), filed February 17, 1984.

this evidence. *State v. Smith,* 106 Wn.2d 772, 780, 725 P.2d 951 (1986).

After reviewing the entire record, we conclude that the opinion of the hearings judge was not "clearly erroneous". RCW 34.04.130(6)(e). Therefore, we reverse the trial court on all issues except its reversal of conclusion of law 9. Thus, we affirm and reinstate the decision of the hearings judge.

RINGOLD, A.C.J., and WILLIAMS, J., concur.

Review denied by Supreme Court February 1, 1988.