[No. 21474-8-I. Division One. April 3, 1989.]

THE STATE OF WASHINGTON, *Respondent*, v. FRANK S. MADISON, JR., *Appellant*.

---

*Helen A. Anderson* of *Washington Appellate Defender Association,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Michael T. Downes* and *Seth Aaron Fine, Deputies,* for respondent.

FORREST, J.—Frank S. Madison, Jr., appeals from his conviction of statutory rape in the first degree, contending that the out-of-court statements made by the complaining witness were improperly admitted, that opinion and expert testimony were improperly admitted, that evidence implicating another person was improperly excluded, and that he was denied effective assistance of counsel at trial. We affirm.

## FACTS

"D",[1] 5 years old, was the complaining witness. D was living with her foster mother, Debra Muir, when Muir observed D masturbating more often than usual, including one incident involving a bath brush. When asked, D refused to say whether anyone had touched her. One day, Muir read to D from a book on human reproduction entitled "Where Did I Come From". Muir again asked D if anyone · had touched her. After being reassured by Muir, D "said 'My Uncle Steve put his,' and pointed at the picture in the book, which was the penis on the male, 'and put it here,' and pointed to her vagina." Muir asked D whether "Uncle Steve" did anything else with his penis, and D said that he put it in her mouth. Muir also asked D whether anyone had seen these acts, and D said that "Auntie Rhonda" had made "Uncle Steve" stop and told her to go home. "Uncle Steve" was D's term for Frank S. Madison. "Auntie Rhonda" was D's term for Madison's companion, Rhonda Gobin.

The next day, Debra Muir was visited by her sister Deanna. During the visit, D said to Debra "Uncle Steve

---

[1] A pseudonym is employed in this opinion to protect the identity of the complaining witness.

humped me, huh, Auntie Debbie?" Debra asked D to repeat this to Deanna. Deanna testified that D pointed at a picture in a book (apparently the book used by Debra), and said it was her Uncle Steve. When asked why she thought that, D again pointed at the picture in the book and said "He put this between my legs."

These statements were reported to D's Child Protective Services (CPS) caseworker, Sherry Schuller–Roth. During an interview, D told Schuller–Roth that Madison had touched her breasts and vagina on at least two occasions, had put his penis in her mouth, and had attempted to put it in her vagina. Schuller–Roth arranged for D to be examined by a pediatrician, Dr. Naomi Katsch. After an examination, Dr. Katsch found that D's hymen was absent, found that her vaginal opening was wider than it should have been for her age, and concluded that her vagina had been penetrated by some object. Dr. Katsch asked D whether anyone had touched her vagina, and D said that Madison had done so "lots" and "a long time ago".

Detective Cothern of the Snohomish County Sheriff's Office was contacted about the allegations. He interviewed D, who told him that Madison had put his penis in her mouth and had touched her vagina with his hand. When Cothern asked whether a neighbor, Brian Reeves, had touched her, D emphatically replied, "Steve, Steve, Steve."

Madison was charged with one count of statutory rape in the first degree. The State filed a notice that it intended to use D's out–of–court declarations, pursuant to RCW 9A.44-.120. A hearing was held to determine the admissibility of the statements and D's competence to testify. After strong reluctance, necessitating a recess, D took the stand. She was able to identify her name and the names of her teachers and friends. She recognized the difference between truth and lies. The State did not question D about her allegations against Madison. Over objection, defense counsel did ask D whether "Steve" had done anything to hurt her, and she answered no.

The court found that D was not competent to testify. This finding is not challenged on appeal. The court then found that the out–of–court statements were admissible under RCW 9A.44.120, after applying the *State v. Ryan* factors for determining indicia of reliability. *State v. Ryan,* 103 Wn.2d 165, 691 P.2d 197 (1984).

At trial, the State presented the testimony of the Muirs, Schuller–Roth, Dr. Katsch, and Cothern, which included D's out–of–court declarations. Madison presented a number of witnesses, including D's mother, father and other relatives, who testified that D had in recent weeks recanted her allegations against Madison and now claimed that someone had raped her at knifepoint on a nearby trail. The relatives believed that a neighbor, Brian Reeves, who had been previously convicted of sexual offenses, was the assailant. During the trial, they prepared a "photo montage" and asked D to identify who molested her. They stated that D identified Reeves. Madison proffered this testimony, but the court rejected it as suggestive and prejudicial.

In rebuttal, the State called Nina Auerbach to present expert testimony regarding the recantation of allegations of abuse made by children. Auerbach testified that in her experience and in her review of the literature, there existed a "recantation phenomenon" where children would recant allegations of abuse. She testified that there were a number of reasons proposed for recantation, including the possibility that the original allegation was false. On cross examination, she admitted that she had not interviewed D, and did not know why D was recanting her allegations.

The jury convicted Madison of statutory rape in the first degree. His motion for new trial was denied, and he appeals.

## OUT–OF–COURT DECLARATIONS

1. Did the court err in admitting the out–of–court declarations of the complaining witness under RCW 9A.44.120, when the court found the complaining witness incompetent

to testify but found that the indicia of reliability supported admission of the declarations?

Madison contends that the court erred in finding sufficient indicia of reliability to satisfy RCW 9A.44.120, as elaborated in *State v. Ryan,* 103 Wn.2d 165, 175, 691 P.2d 197 (1984), especially in light of the finding that the complaining witness was incompetent to testify at trial. Incompetence to testify does not per se preclude the admission of prior hearsay statements of the child witness, if sufficient reliability is established. *State v. John Doe,* 105 Wn.2d 889, 719 P.2d 554 (1986). The trial court considered the appropriate *Ryan* elements in some detail and concluded that sufficient reliability was established to justify admission of the hearsay statements.

 Madison particularly urges that the child's statements were not made spontaneously, thus failing to satisfy the fourth factor in *Ryan.* He is correct that the statements were made when the foster mother was asking questions in the course of sharing a book on human reproduction with the child. But "spontaneity" is only one factor. The court is to make its judgment based on all the indicia of reliability. We agree with the trial court that while the setting was not spontaneous, the details of the event and the identity of the defendant were not suggested and were "spontaneously" volunteered. Indeed, the foster mother testified that she was "a little stunned" by the child's accusation.

 In evaluating whether the recantation demonstrated unreliability, we note that it did not occur until approximately 3 weeks before trial. The child had been almost 7 months in the company of her "aunt", Rhonda Gobin, who believed Madison to be innocent. The trial court is vested with considerable discretion in evaluating indicia of reliability. *State v. Hancock,* 46 Wn. App. 672, 676, 731 P.2d 1133 (1987), *aff'd,* 109 Wn.2d 760, 748 P.2d 611 (1988). We find no abuse of that discretion in admitting D's out-of-court declarations pursuant to RCW 9A.44.120.

## Opinion Testimony

2. Did the court err in allowing opinion testimony from a CPS caseworker regarding the behavior of the complaining witness during an interview?

D's CPS caseworker, Schuller–Roth, testified that D's masturbation was "typical of a sex abuse victim"; that when D spoke to her "it was obvious she was very relieved, very comfortable that she was not needing to maintain the secret", and that D waited to make her accusations because "she was very clearly aware of the impact her disclosure would have on many people whom she loved". No objection was made at trial to these statements. Madison urges that the issue can be raised for the first time on appeal because the testimony amounts to a statement of belief in the victim's story (and therefore in Madison's guilt), thus invading the province of the jury. *State v. Carlin,* 40 Wn. App. 698, 700 P.2d 323 (1985); *State v. Garrison,* 71 Wn.2d 312, 315, 427 P.2d 1012 (1967).

No witness may express his opinion that the defendant is guilty, *State v. Haga,* 8 Wn. App. 481, 507 P.2d 159, *review denied,* 82 Wn.2d 1006 (1973), or express an opinion as to the truth of a child's statement to him, hence, indirectly opining that the defendant is guilty. *State v. Fitzgerald,* 39 Wn. App. 652, 694 P.2d 1117 (1985). A witness may properly describe the manner and demeanor of a child at the time he is making such statements, and that description may include inferences. *State v. Wigley,* 5 Wn. App. 465, 466–68, 488 P.2d 766 (1971), states:

> The general rule is that witnesses are to state facts, and not to express inferences or opinions. *State v. Dukich,* 131 Wash. 50, 228 P. 1019 (1924). Expressed definitively, it is said that a layman who sees the commission of a crime can describe the acts, the appearance and the demeanor of a defendant, from which inferences as to a defendant's mental processes may be drawn. *State v. Farley,* 48 Wn.2d 11, 290 P.2d 987 (1955). While it is a rule easily stated, it is often difficult to apply when the question arises at trial. It may be that in many cases it is impossible for a witness to testify in terms of pure

fact; testimony inherently involves a "thinking out into language", the transformation of thought to word, and the thought process involves much more than mere recording of fact. In *State v. Riggs*, 32 Wn.2d 281, 283, 201 P.2d 219 (1949), our Supreme Court quoted the following passage from 32 C.J.S. *Evidence* § 459, at 101:

"Much effort is expended during the trial of causes to confine the testimony of witnesses to statements of what they saw, heard, or otherwise observed, as distinguished from the inferences or opinions formed as a result of such observation. The distinction is, however, one which it is in many cases impossible to draw, for the reason that the most simple statement of fact involves an element of coordination, induction, or inference, the fact and the inference being frequently so blended that they cannot be separated. The modern tendency is to regard it as more important to get to the truth of the matter than to quibble over distinctions which are in many cases impracticable, and a witness is permitted to state a fact known to or observed by him, even though his statement involves a certain element of inference.

That quotation lucidly expresses the inherent problems of the "opinion" rule and the practical adjustments that have been made by many courts.

These adjustments, both actual and suggested, were embodied in rule 401 of the Model Code of Evidence of the American Law Institute, chapter 5, Expert and Opinion Evidence (1942) at 199. This rule has been repeatedly cited with approval by our courts. Its purpose is to facilitate the giving of testimony by lay and expert witnesses through a prudently simplified testimonial procedure. To this end it allows them to testify in language ordinarily used and easily understood by the judge and jury; they may testify in terms which include inference or conclusions, subject to control by the trial court, which may require they first relate the data upon which the inferences are founded. Obviously, such inferential testimony is limited to matters which the witness has personally observed.

In the present case, the questions asked by the prosecutor may well have been arguably improper, but the answers of the witnesses given in terms of "appearance" and based on personal acquaintance and observation

were quite proper. It is proper for a lay witness, in relating his observations, to testify in terms which include inferences and to state all relevant inferences, whether or not they embrace ultimate issues to be decided by the trier of fact, unless the trial judge, exercising judicial discretion, determines that drawing such inferences requires special skill or knowledge or would tend to mislead the jury. *See* rule 401 of the Model Code of Evidence. We, therefore, conclude that the court did not err in allowing the answers herein.

(Footnotes omitted.)[2]

While there are circumstances in which it is difficult to distinguish whether a statement falls in one category or the other, we are satisfied that some of the statements made by Schuller–Roth would properly have been subject to an objection or motion to strike. However, no such objection or motion was forthcoming.

▇ The question then becomes whether the admission of such testimony without objection constituted "manifest constitutional error?" Appellate courts are and should be reluctant to conclude that questioning, to which no objection was made at trial, gives rise to "manifest constitutional error" reviewable for the first time on appeal. The failure to object deprives the trial court of an opportunity to prevent or cure the error. The decision not to object may be a sound one on tactical grounds by competent counsel, yet if raised

---

[2]Model Code of Evidence, Rule 401 (1942) stated:

"Testimony in Terms of Opinion.

"(1) In testifying to what he has perceived a witness, whether or not an expert, may give his testimony in terms which include inferences and may state all relevant inferences, whether or not embracing ultimate issues to be decided by the trier of fact, unless the judge finds

"(a) that to draw such inferences requires a special knowledge, skill, experience, or training which the witness does not possess, or

"(b) that the witness can readily and with equal accuracy and adequacy communicate what he has perceived to the trier of fact without testifying in terms of inference or stating inferences, and his use of inferences in testifying will be likely to mislead the trier of fact to the prejudice of the objecting party.

"(2) The judge may require that a witness, before testifying in terms of inference, be first examined concerning the data upon which the inference is founded."

successfully for the first time on appeal, may require a retrial with all the attendant unfortunate consequences. Even worse, and we explicitly are not referring to counsel in this case, it may permit defense counsel to deliberately let error be created in the record, reasoning that while the harm at trial may not be too serious, the error may be very useful on appeal. Madison relies upon *State v. Carlin, supra.* However, in *Carlin,* the officer testified that his dog had followed "a fresh guilt scent", which was the equivalent of opining that the defendant was guilty. In this case, Schuller–Roth neither asserted that Madison was guilty nor explicitly asserted that she believed D's story. The authoritative approach to these problems is contained in *State v. Scott,* 110 Wn.2d 682, 688, 757 P.2d 492 (1988):

> The proper way to approach claims of constitutional error asserted for the first time on appeal is as follows. First, the appellate court should satisfy itself that the error is truly of constitutional magnitude—that is what is meant by "manifest". If the asserted error is not a constitutional error, the court may refuse review on that ground. If the claim is constitutional, then the court should examine the effect the error had on the defendant's trial according to the harmless error standard set forth in *Chapman v. California,* [386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967)].

(Footnote omitted.) Applying this standard, we find that Schuller–Roth's testimony does not constitute manifest constitutional error. Accordingly, it may not be raised for the first time on appeal.

 It is further urged that defense counsel's failure to object constitutes ineffective assistance of counsel. The decision of when or whether to object is a classic example of trial tactics. Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal. *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *State v. Ermert,* 94 Wn.2d 839, 621 P.2d 121 (1980). The prejudice here was slight. In describing her statements, Schuller–Roth did not expressly assert her

belief in D's truthfulness. The lack of objection does not demonstrate ineffective assistance of counsel.

## RECANTATION TESTIMONY

3. Did the court err in allowing expert testimony regarding "recantation phenomenon" to rebut testimony that the complaining witness had recanted prior to trial?

Madison argues that the court erred in admitting the testimony of Auerbach regarding "recantation phenomenon" because the testimony lacked scientific foundation and invaded the province of the jury. He contends that "recantation phenomenon" did not satisfy the *Frye*[3] standard for scientific expert testimony because the State did not establish the phenomenon "as a scientifically reliable means of proving" that the recantation was false. *State v. Black,* 109 Wn.2d 336, 342, 745 P.2d 12 (1987). He argues that neither Auerbach's personal experience nor her review of the literature provided a sufficient foundation for admission of the evidence. *State v. Maule,* 35 Wn. App. 287, 294, 667 P.2d 96 (1983). Finally, he urges this court to adopt the holding of *Hester v. Commonwealth,* 734 S.W.2d 457 (Ky. 1987), which rejected the use of rebuttal testimony offered to prove that children do not recant allegations of sexual abuse unless the family has put pressure on them.

At the outset, we note that while admitted through the testimony of an expert witness, the central assertion, that some recantations by child victims occur where the original accusation is true, is largely a question of empirical fact. The testimony stated such to be the case. Auerbach offered various possible explanations for such recantations, including the possibility that the original accusation was false. Auerbach made no effort to identify an explanation for the complaining witness, having never interviewed her. Unlike the "rape trauma syndrome" testimony found improper in *State v. Black, supra,* this testimony was not presented to prove that the existence of a present symptom proves that

---

[3]*Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923).

a rape was the cause of that symptom. The testimony is offered to explain that one can not necessarily conclude that a present recantation proves that the original accusation was false. There is no indication, contrary to Madison's contention, that explanations for D's recantation, to the extent it occurred, were presented to prove any element of the crime.

The "recantation phenomenon" testimony is much closer to the "battered woman syndrome" testimony approved in *State v. Ciskie,* 110 Wn.2d 263, 751 P.2d 1165 (1988), to explain why victims may fail to break off a violence–filled relationship or to report acts of violence to the police. Such evidence is offered not to establish that the crime was committed, but rather to explain that failure to leave or the failure to report does not necessarily demonstrate that the crime did not occur. Even closer is the testimony approved in *State v. Petrich,* 101 Wn.2d 566, 573–76, 683 P.2d 173 (1984), which presented reasons for delays in reporting abuse by a child victim. To an average juror, it may appear that a delay in reporting by either an adult or a child, or a recantation of previous allegations, strongly indicates that the alleged event never happened. The testimony approved in *Ciskie* and *Petrich,* and that presented in this case, "will assist the trier of fact to understand the evidence or to determine a fact in issue". ER 702.

The foundation for Auerbach's testimony is inadequate to permit an informed appellate review. She relied on some personal experiences, but did not detail how she determined when recantations occurred in cases where the original claim was independently verified. Her general statements such as "review of the literature" and "major writers in the field" are hardly adequate when there is no prior Washington authority for admission of expert testimony on the subject. Other than an objection based on *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), there was no detailed or searching examination of the basis for Auerbach's knowledge and testimony. In extenuation, it is noted that Auerbach was not contacted by the prosecutor

until the day before her testimony. Neither the prosecutor nor defense counsel, nor indeed the witness, had an adequate opportunity to prepare for a careful evaluation of the basis and extent of her testimony.

The trial court is vested with broad discretion in passing on the qualifications and scope of testimony of an expert witness. *Oliver v. Pacific Northwest Bell Tel. Co.,* 106 Wn.2d 675, 683, 724 P.2d 1003 (1986). In the absence of any detailed challenge to the foundation and basis of Auerbach's testimony, or a motion to strike at the conclusion of her testimony, we conclude that a claim of abuse of discretion in the trial court's ruling may not be raised for the first time on appeal. However, in finding no error preserved for appeal, we expressly limit our ruling to the record in this case. We express no opinion as to the admissibility of testimony explaining recantation by a child victim in future cases. That decision awaits a fully developed record. Without attempting to review or evaluate the literature, we note there has been considerable recent discussion of the significance of recantation by child witnesses. A list of the behavioral, psychological, and legal literature regarding recantation in child victims collected by this court is contained in the appendix following this opinion.

It is urged that failure to thoroughly explore the basis of Auerbach's testimony constitutes ineffective assistance of counsel, citing *Strickland v. Washington, supra,* and *State v. Thomas,* 109 Wn.2d 222, 225, 743 P.2d 816 (1987). We approach this argument with the same considerations discussed with regard to lack of cross examination of Schuller–Roth. Full examination and exploration of the basis for Auerbach's opinions might well have strengthened rather than weakened her testimony. A substantial majority of the courts considering the issue have approved the admission of testimony regarding recantation and delays in reporting, so long as the testimony is not presented to prove an element

of the crime.[4] This suggests that a detailed challenge by defense counsel may well have developed an adequate basis and strengthened the expert's testimony. Defense counsel had the opportunity to argue the lack of specifics in Auerbach's testimony in urging the jury to disregard it during closing argument. Under the facts of this case, we find that counsel's failure to vigorously challenge Auerbach's testimony was a permissible tactical decision and does not constitute ineffective assistance of counsel.

EVIDENCE IMPLICATING ANOTHER

4. Did the court err in excluding evidence that the complaining witness had identified another person as her abuser?

█ Testimony was proffered that D had identified Brian Reeves in a photograph montage as the man who had attacked her on the trail. This is, of course, hearsay, and its admissibility should be determined pursuant to RCW 9A.44.120. There are no reasons to treat hearsay differently when offered by a defendant than when offered by the State. The relevance of the "identification" was minimal, because the existence of another attacker does not exculpate Madison. The trial judge was entitled to consider all the circumstances surrounding the presentation of the montage and the fairness of the montage itself. Here, the family members who prepared the montage and offered the testimony were all actively engaged in assisting Madison's case. The montage was first shown to the child during an

---

[4]*People v. Bowker,* ___ Cal. App. 3d ___, 249 Cal. Rptr. 886 (1988) (recantation and delay); *Kirkpatrick v. State,* 747 S.W.2d 833 (Tex. Ct. App. 1987) (recantation and delay); *State v. Moran,* 151 Ariz. 378, 728 P.2d 248 (1986) (recantation); *State v. Bowman,* 715 P.2d 467 (N.M. Ct. App. 1986) (recantation and delay); *Smith v. State,* 100 Nev. 570, 688 P.2d 326 (1984) (delay); *People v. Benjamin R.,* 103 A.D.2d 663, 481 N.Y.S.2d 827 (1984) (recantation and delay); *State v. Middleton,* 294 Or. 427, 657 P.2d 1215 (1983) (recantation and delay). *But see Hester v. Commonwealth, supra* (recantation).

evening in the midst of trial, many months after the incident. The purpose of the montage was to exonerate Madison, not identify an attacker in the course of an investigation.

Madison cites *Rock v. Arkansas,* 483 U.S. 44, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987) for the proposition that he has a constitutional right to present any evidence he desires in his defense. *Rock* held that the defendant's constitutional right to testify in her own behalf could not be prevented by operation of a state rule of evidence that prohibited any testimony that has been enhanced by hypnosis. *Rock* presents unusual facts and the holding is a narrow one; specifically that the defendant's proffered testimony must be evaluated on an individual basis. There is nothing in *Rock* to suggest that defendants in general are exempted from the normal rules of evidence in presenting their case. The admission or exclusion of the proposed testimony rests in the sound discretion of the trial court. *State v. Hudlow,* 99 Wn.2d 1, 15, 659 P.2d 514 (1983); *State v. Rice,* 48 Wn. App. 7, 737 P.2d 726 (1987). We find no abuse of discretion in the court's exclusion of the proffered evidence as suggestive and prejudicial.

In view of our disposition of the case, it is unneccessary to consider the State's assignment of error.

The judgment is affirmed.

### APPENDIX

The behavioral and psychological aspects of recantation have been discussed in: S. Sgroi, *Handbook of Clinical Intervention in Child Sexual Abuse* 71 (1982); K. MacFarlane & J. Waterman, *Sexual Abuse of Young Children* 169 (1986); J. Haugaard & D. Repucci, *The Sexual Abuse of Children* 178 (1988); Summit, *The Child Sexual Abuse Accommodation Syndrome,* 7 Int'l J. of Child Abuse & Neglect 177 (1983); Jones & McGraw, *Reliable and Fictitious Accounts of Sexual Abuse to Children,* 2 J. Interpersonal Violence 27 (1987); and Quinn, *The Credibility of Children's Allegation of Sexual Abuse,* 6 Behavioral Sci. & the L. 1981 (1988).

The legal aspects of recantation and its admissibility have been discussed in: McCord, *Expert Psychological Testimony About Child Complainants in Sexual Abuse Prosecutions: A Foray Into the Admissibility of Novel Psychological Evidence*, 77 J. Crim. L. & Criminology 1 (1986); Comment, *The Admissibility of "Child Sexual Abuse Accommodation Syndrome" in California Courts*, 17 Pac. L.J. 1361 (1986); Note, *The Unreliability of Expert Testimony on the Typical Characteristics of Sexual Abuse Victims*, 74 Geo. L.J. 429 (1985); Comment, *The Admissibility of Expert Testimony in Intrafamily Child Sexual Abuse Cases*, 34 U.C.L.A. L. Rev. 175 (1986); Note, *Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses*, 68 B.U. L. Rev. 155 (1988); and Comment, *Syndrome Testimony in Child Abuse Prosecutions: The Wave of the Future?*, 8 St. Louis U. Pub. L. Rev. 207 (1989).

SWANSON and SCHOLFIELD, JJ., concur.

Review denied at 113 Wn.2d 1002 (1989).