# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,              )   NO. 71330-2-I
                                  )
                   Respondent,    )   DIVISION ONE
                                  )
         v.                       )
                                  )
ANTON CURTIS JOHNSON,             )   UNPUBLISHED OPINION
                                  )
                   Appellant.     )   FILED: August 31, 2015
                                  )
_____ )

LAU, J. — A jury convicted Anton Johnson of three counts of third degree rape of a child. He appeals, arguing that reversal of his convictions is warranted because (1) improper election of prior uncharged crimes by the State violated various constitutional rights; and (2) ineffective assistance by trial counsel deprived him of a fair trial. Johnson also claims remand for resentencing is warranted for violation of the statutory maximum based on the court's imposition of a variable term of community custody. Because no constitutional violations occurred, trial counsel provided effective representation, and the court properly imposed a variable term of community custody under State v. Bruch, 182 Wn.2d 854, 346 P.3d 724 (2015), we affirm Johnson's judgment and sentence.

## FACTS

### Des Moines Residence

K.K.'s grandmother and Anton Johnson dated and eventually moved in with K.K.'s mother in Des Moines. K.K. and her five sisters also lived with their mother. K.K. was in the sixth grade and was 11 or 12-years-old at that time. Johnson took an interest in K.K. They liked each other and talked a lot. He told her she was cute and praised her for doing her homework. He held her hand under the covers to avoid detection whenever they watched TV together. After he kissed her in her grandmother's bedroom, he touched her more often. For example, he kissed her on the neck and digitally penetrated her vagina in her grandmother's bedroom.

### Fir Street Residence

The entire family including Johnson moved to Fir Street in Seattle. By then, K.K. was 13-years-old and in the seventh grade. There, Johnson performed oral sex on K.K. under the covers while K.K.'s sister, T.K., was on the phone across the room. On a different day, he picked her up, positioned her on the kitchen counter with her legs open, and "put it in" her until she felt a pop and it hurt a lot. Report of Proceedings (RP) (Oct. 29, 2013) at 253.

### Brighton Street Residence

The family moved to Brighton Street when K.K. was 14 and in the eighth grade. There, Johnson "had sex" with K.K. for the first time. RP (Oct. 29, 2013) at 249. K.K. was watching TV. Johnson turned off the TV and started kissing her. He used no condom and "put it inside of [her]." He stopped when she said it hurt and then performed oral-genital contact. RP (Oct. 29, 2013) at 250.

In late 2011, K.K.'s grandmother had surgery and radiation treatment for cancer. She was confined to her bedroom to avoid exposing others to radiation. During this time, Johnson slept in the living room or in the den where K.K. sometimes slept. While the family slept, he had sex with K.K. Between September 15, 2011, and April 1, 2012, Johnson had sexual intercourse with K.K. at least 15 times.[1] This happened more often in the den at night when the family was asleep. Sometimes they quickly had sex in K.K.'s bedroom.

In March 2012, K.K.'s mother took her to the doctor due to stomach pain and nausea. The doctor told her she was pregnant. K.K. was 14-years-old. To keep her relationship with Johnson a secret, K.K. let her mother assume that the father was her teenage boyfriend. Johnson and K.K. stopped having sex in March 2012 after K.K. had an abortion. She told clinic staff her teenage boyfriend was the father to keep Johnson's identity a secret.

About 11 months later, K.K. told T.K., her younger sister, that Johnson was the true father. T.K. cried, telephoned Johnson, and threatened to "kill him." RP (Oct. 29, 2013) at 153, 268-69. K.K.'s grandmother noticed Johnson standing quietly with the telephone and asked what was wrong. He said T.K. just "cussed [him] out." RP (Oct. 29, 2013) at 207. K.K.'s grandmother telephoned K.K.'s mother to ask why T.K. was so angry. K.K.'s mother confronted T.K. T.K. told her that Johnson "hurt" K.K. and got K.K. pregnant. RP (Oct. 29, 2013) at 155. K.K.'s mother called the police a few days later after K.K. confirmed that what T.K. said was true.

---

[1] The parties agree that K.K. turned 14-years-old on September 15, 2011.

Seattle Police Officer Eric Beseler responded and talked to T.K. and K.K.'s mother. T.K. told Officer Beseler that K.K. said she had sex with Johnson for the first time when she was 11-years-old. After K.K.'s mother reported the offense to the police, Johnson telephoned K.K.'s mother. He acknowledged to her "that it did happen" but claimed "[K.K.] came on to me." RP (Oct. 29, 2013) at 129. K.K.'s grandmother also confronted Johnson about what he did to K.K. At first he denied having sex with K.K., but later admitted, "Do you want to know the truth? It happened." RP (Oct. 29, 2013) at 210. He also said K.K. performed oral sex on him.

On May 28, 2013, Johnson was charged with three counts of third degree rape of a child. The State alleged that Johnson had "sexual intercourse" with K.K. when she was at least 14 and "during a period of time intervening between September 15, 2011 through April 1, 2012 . . . ." Clerk's Papers (CP) at 1-2. During the trial, the State presented evidence of two pre-charging period sex acts that occurred at the Fir Street residence when K.K. was under 14 and in seventh grade.[2]

At trial, K.K. described the first uncharged act involving oral sex under the covers:

> [K.K.]: I was in 7th grade and we lived on Fir Street.[3] I was in the room with [T.K.]. She was like on her phone. Everyone else was in the living room, watching TV. I was on like my phone. He [Johnson] had told me that he wanted to taste me. It was like an awkward moment.

---

[2] The undisputed evidence shows that K.K. was in eighth grade when she turned 14 on September 15, 2011, the first day of the charging period.

[3] During the charging period, K.K., her sisters, mother, grandmother, and Johnson lived in the apartment on Brighton Street.

-4-

> So, he like, I took my panties off and he like went under the covers and then he did it. Then he told me like watch if anybody was like coming or something.

RP (Oct. 29, 2013) at 252 (emphasis added). She referred to the second uncharged act involving sexual intercourse as the "counter" incident:

> [STATE]: There was another time that you mentioned in the interview with the defendant that the defendant's lawyer that had to do with the counter. Do you remember that incident?
>
> [K.K.]: A counter, yes.
>
> [STATE]: Tell the jury about that time?
>
> [K.K.]: I was in 7th grade.
> Me and Anton [Johnson] had went in the kitchen. He put me on the counter and he opened my legs and then he like, put it in, in like, I felt like a pop, it hurt a lot.
> Then I just like pushed him back. Then I hop off the counter and kind of said like somebody is coming or something.

RP (Oct. 29, 2013) at 253-54 (emphasis added). K.K was the only witness to testify about these uncharged acts. She testified that the first time she and Johnson "had sex" was when she was 14 and lived in the Brighton house. RP (Oct. 29, 2013) at 250-51. Both the "under-the-covers" and the "counter" incidents (collectively, the "Fir Street incidents") occurred when K.K. was in 7th grade and living in the Fir Street house—before she moved to the Brighton house, where she lived during the charging period. RP (Oct. 29, 2013) at 120-25, 252-54, 275.

During closing argument, the prosecutor reminded the jury that they must agree on a singular criminal event for each of the three counts. He mistakenly argued that the Fir Street incidents occurred during the charging period:

You have to agree on a singular event for Count I, a singular event for Count II, and a singular event for Count III. I suggest there is two ways that you can do that in this case.

[K.K.] told you that between those charging dates they were on Brighton Street, the defendant had sex with her, she believes roughly 15 times. She described to you with specific detail three separate incidents and two of them I just mentioned. The first was that first time in the living room. The second was a time on the counter. The third time was a time when he had oral sex with her under the blanket as [T.K.] played with her phone on the bed across the room.

Then she described to you all of the incidents that occurred in the den. She said that she thought there were 10 or 15 of those. You can either agree, for example, that Count I has been proven by your unanimous agreement on the first time he ever had sex with her.

Count II is proven by your unanimous agreement about the time that he described on the counter.

Count III is described by your unanimous agreement that at least one time he had sexual intercourse with her in that den, or you agree with the occasion that he described which occurred underneath the blanket in the room with [T.K.].

RP (Oct. 30, 2013) at 331-32 (emphasis added).

The jury convicted Johnson as charged. The trial court denied Johnson's motion for new trial, or alternatively, to dismiss counts two and three. The court imposed three concurrent terms of the statutory maximum of 60 months, followed by a period of community custody "for any period of time the defendant is released from total confinement before the expiration of the maximum sentence." CP at 36-37. Johnson appeals.

## ANALYSIS[4]

### Uncharged Sex Acts

Johnson argues that the State presented evidence of sexual intercourse that occurred before the charging period. He contends that his convictions on counts two

---

[4] Johnson filed no brief in reply to the State's response brief.

and three should be reversed because the prosecutor's closing argument "elected" acts falling outside the charging period that "could not legally constitute third degree rape of a child." Br. of Appellant at 7. He also claims the prosecutor "wrongly [claimed] they occurred during the charging period when K.K. lived on Brighton Street." Br. of Appellant at 10. Accordingly, the State violated his constitutional rights to (1) sufficiency of the evidence, (2) a unanimous jury verdict, (3) notice, and (4) a fair trial. We disagree.

Sufficiency of the Evidence

Johnson specifically argues that because the State "elected" in closing argument to rely on acts that happened before the charging period when K.K. was less than 14-years-old, insufficient evidence exists to support his convictions on counts two and three. Johnson claims that K.K. could not remember dates or details about the Brighton Street acts even though she testified he had sex with her there at least 15 times. Viewing the evidence in the light most favorable to the State, we conclude a rational jury could find the essential elements of the crimes of third degree rape of K.K.

Under RCW 9A.44.079, third degree rape of a child occurs when a person (1) has sexual intercourse with a child, (2) who is at least fourteen years old but less than sixteen years old, (3) who is not married to the person, and (4) who is at least forty eight months younger than the person. Here, the to-convict instruction informed the jury that to convict Johnson of third degree rape of a child, each of the following elements must be proved beyond a reasonable doubt:

> (1) . . . during a period of time intervening between September 15, 2011 and April 1, 2012 the defendant had sexual intercourse with [K.K.];

-7-

(2) . . . [K.K.] was at least fourteen and less than sixteen years old at the time and was not married to the defendant;

(3) . . . the defendant was at least forty-eight months older than [K.K.]; and

(4) . . . the acts occurred in the state of Washington.

CP at 26.[5]

Evidence is sufficient to support multiple counts of child rape if the jury is also instructed as to the need for jury unanimity on a specific act for each count. The trial court also gave the jury a Petrich instruction to ensure jury unanimity. Read together, the to-convict instruction (jury instructions 7, 8, and 9) and the Petrich instruction (jury instruction 6) required the jury to unanimously agree as to a particular act that constitutes the charge for each count and to find beyond a reasonable doubt that the State proved all the elements set forth in the to-convict instructions.

In a criminal prosecution, the State must prove each element of the charged crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d. 368 (1970). "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (internal citations omitted).

---

[5] The court gave this same to-convict instruction for each of the three counts of third degree rape of a child.

Where, as here, the perpetrator is a "resident" molester, the State may support multiple counts of a child rape charge with the victim's generic testimony. State v. Hayes, 81 Wn. App. 425, 438, 914 P.2d 788 (1996). In Hayes, we approved the use of generic testimony to support multiple counts when the evidence satisfies three requirements:

> First, the alleged victim must describe the kind of act or acts with sufficient specificity to allow the trier of fact to determine what offense, if any, has been committed. Second, the alleged victim must describe the number of acts committed with sufficient certainty to support each of the counts alleged by the prosecution. Third, the alleged victim must be able to describe the general time period in which the acts occurred. The trier of fact must determine whether the testimony of the alleged victim is credible on these basic points.

Hayes, 81 Wn. App. at 438.[6] Considering the victim's testimony in light of these requirements, we concluded sufficient evidence supported multiple counts of child rape against Hayes:

---

[6] Citing State v. Brown, 55 Wn. App. 738, 780 P.2d 880 (1989), we noted the important policy considerations supporting admission of general testimony in cases involving a resident molester:

> The Brown court first acknowledged the problems inherent in prosecuting cases of sexual molestation against children when the perpetrator is a "resident molester." Recognizing that Washington courts have approved of such "general" testimony in the context of its admissibility, the court reiterated that "[t]o require [the victim] to pinpoint the exact dates of oft-repeated incidents of sexual contact would be contrary to reason." The court . . . [concluded] that
>
> > [r]endering such testimony as was given here inadequate even under a unanimity instruction would force prosecutors to make an election that the Petrich court described as "impractical." With the exception of those who happen to select victims with better memories or who are 1-act offenders, the most egregious child molesters effectively would be insulated from prosecution.
>
> [Brown, 55 Wn. App. at 749.] . . . [The court observed] that the use of such evidence was sufficient to support the conviction.

Hayes, 81 Wn. App. at 435-36.

K.'s testimony that Hayes "put his private part in mine" establishes the first prong of the requirement, specificity of description of the acts. Her descriptions of how he did these acts add to the specificity prong. She described Hayes' usual course of conduct in detail (it would happen in his bed, while he was on top of her, and he used paper towels to clean up) and tied the abuse to events in her life occurring at that time (when she was living with Nicky, while they were staying with Donaldson, and two weeks before authorities took her away from Hayes in June 1992). Her testimony that he had intercourse with her at least "four times" and up to "two or three times a week" establishes the second prong. Her further testimony that these acts occurred during the period between 1990 and 1992 is sufficient to establish the third prong. Thus, K.'s testimony described the type of act committed, the number of acts committed, and the general time period. Her generic testimony was therefore specific enough to sustain separately each of the four counts charged.

Hayes, 81 Wn. App. at 438-39.

Here, K.K.'s testimony is substantially similar to the victim's testimony in Hayes that lead us to conclude sufficient evidence supported the convictions. Regarding the first prong, K.K.'s testimony was sufficiently specific such that the trier of fact could determine the nature of the committed offense. K.K. stated that the first time Johnson "had sex" with her was when she was 14 and living in the Brighton house. RP (Oct. 29, 2013) at 249-51. She provided specific details of this incident: "I had came out of the bathroom and I was like laying down. He was sitting on the couch watching TV, I was like, getting ready to like to go to bed. He had turned off the TV and rolled me over and then we started kissing. Then he like—put it inside of me." RP (Oct. 29, 2013) at 250. She further clarified that this occurred in the living room at night, that Johnson did not use a condom, and that everyone else was in their rooms at the time. She stated that it "really hurt" so Johnson "took it out" and performed oral sex on K.K. instead. RP (Oct. 29, 2013) at 251. K.K. indicated that other instances were similar to the first, and that she and Johnson developed a regular pattern of sexual activity:

-10-

[STATE]: Can you remember another time that [Johnson] had sex with you in the Brighton house?

[K.K.]: I don't really remember specific times. But they mostly happened in the den, because that's where we usually were, him and I.

Everyone was usually asleep or something. Sometimes I would sleep in there. He would sleep in there, when my grandmother was having, like, radiation or something.

Then like he sometimes would like wake me up and then we would just do it.

. . .

[STATE]: Were there times at night after you got back from training, or school, that people just kind of stuck to their own place and did their own thing watching TV or studying or whatever?

[K.K.]: Yes.

So it was pretty easy not to get caught because people were like, pretty preoccupied doing their own thing.

[STATE]: Did any of these sexual encounters take a long time or were they all fairly brief?

[K.K.]: Sometimes, like—most of the time, when we did it in the den, it was like longer, because no one was ever up. Like we would have more time. But sometimes we go in my room, like, if no one was in there and like get it like a quick one, kind of, in a way of saying, like.

[STATE]: You mentioned that you slept in the den occasionally. Why did you sleep in the den?

[K.K.]: Because, like, by now that we like knew that we had a thing, and that's mostly where—like everything went down. So, he knew that I would be in there. I knew that he would be in there. So we, basically, just like stuck to that room.

[STATE]: When he would come into that room and have sex with you, what—would it be late at night, after everybody else was long asleep?

[K.K.]: Yes.

[STATE]: Like what times?

[STATE]: Like around 11 o'clock or later, if he like were to wake up.

[STATE]: When all this was going on, how did you feel about Anton [Johnson]?

[K.K.]: I liked him. I wouldn't say that I was like in love or anything.

RP (Oct. 29, 2013) at 251-55. Like the victim in Hayes, K.K.'s testimony shows the "usual course of conduct" regarding Johnson's pattern of abusive behavior. See Hayes, 438-39.

The second prong was met when K.K. estimated the number of times she and Johnson had sexual intercourse during the charging period:

[STATE]: Just a couple more questions, [K.K.].
Between September 15, 2011 and April 1st, 2012, or the time that you got the abortion, how many times do you think that Anton [Johnson] had sexual intercourse with you?

[K.K.]: At least 15 times. I am pretty sure it was probably more.

RP (Oct. 29, 2013) at 273. This estimate is sufficient to satisfy the requirement in Hayes that the victim "describe the number of acts committed with sufficient certainty to support each of the counts alleged by the prosecution." Hayes, 81 Wn. App. at 438. In Hayes, the victim testified that sexual intercourse occurred "at least four times and some two or three times a week between July 1, 1990 and May 31, 1992." Hayes, 81 Wn. App. at 435. The court concluded that this testimony satisfied the second prong. Here, K.K.'s testimony is nearly identical to the victim's testimony in Hayes, and it likewise satisfies the second prong.

The third prong was satisfied by K.K.'s description of the general time period in which the acts occurred. In addition to responding to the State's direct question regarding the charging period, K.K. provided many other details indicating the time period during which the events occurred. For instance, K.K.'s description of Johnson's

-12-

pattern of sexual misconduct generally references the Brighton house. Other witnesses, including K.K.'s mother, corroborated that K.K.'s family lived with Johnson in the Brighton house during the charging period. K.K. also testified that she and Johnson had sexual intercourse during several nights when K.K.'s grandmother was sick from radiation treatment. K.K.'s grandmother testified that she was recovering from radiation treatment while living with K.K.'s family in the Brighton House during the charging period. In light of these specific details, K.K.'s testimony provided sufficient facts to establish the third prong of the Hayes test. See Hayes, 81 Wn. App. at 438–39.

Given the court's proper instructions to the jury and K.K.'s ample testimony under Hayes,[7] the State presented sufficient evidence of criminal acts within the charging period to support Johnson's convictions on counts two and three. This is particularly true considering the deferential standard of review applied to challenges based on the sufficiency of the evidence. See Salinas, 119 Wn.2d at 201.

Unanimous Jury Verdict

Johnson also contends that his convictions on counts two and three violate his right to a unanimous jury verdict. Johnson argues that the prosecutor's closing remarks "elected" acts that fell outside the charging period, thus the jury may have convicted him of uncharged and legally insufficient acts. We disagree. As discussed above, the trial court gave proper and clear instructions requiring the jury to agree on specific acts for each count within the charging period. We presume the jury followed those instructions. State v. Montgomery, 163 Wn.2d 577, 596, 183 P.3d 267 (2008) ("There was no written

---

[7] Johnson fails to address Hayes anywhere in his brief.

-13-

jury inquiry or other evidence that the jury was unfairly influenced, and we should presume the jury followed the court's instructions absent evidence to the contrary.")

When the State introduces evidence of several criminal acts and any one of which could constitute the crime charged, the jury must unanimously agree on the act or incident that constitutes the crime. State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984) overruled in part on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988). In these "multiple acts" cases, courts employ the "either/or" rule:

> Either the State [must] elect the particular criminal act upon which it will rely for conviction, or . . . the trial court [must] instruct the jury that all of them must agree that the same underlying criminal act has been proven beyond a reasonable doubt.

Kitchen, 110 Wn.2d at 411; see also Petrich, 101 Wn.2d at 572. "[T]he State need not elect particular acts associated with each count so long as the evidence 'clearly delineate[s] specific and distinct incidents of sexual abuse' during the charging periods." Hayes, 81 Wn. App. at 431 (quoting State v. Newman, 63 Wn. App. 841, 851, 822 P.2d 308). Further, "[t]he trial court must also instruct the jury that they must be unanimous as to which act constitutes the count charged and that they are to find 'separate and distinct' acts for each count when the counts are identically charged." Hayes, 81 Wn. App. at 431 (quoting State v. Noltie, 116 Wn.2d 831, 842–43, 809 P.2d 190 (1991)).

Johnson argues the State improperly "elected" the Fir Street incidents and, as a result, "there can be little doubt that the jury relied on these crimes not charged." Br. of Appellant at 12. In his closing remarks, the prosecutor mistakenly suggested that the jury could rely on the Fir Street incidents as a basis for convicting Johnson on counts

two and three. We disagree with Johnson's characterization that the prosecutor elected to rely on the Fir Street incidents.

The record in this case leaves no doubt that the prosecutor made no "election" as Johnson alleges. In closing argument, the prosecutor discussed the interplay between the Petrich instruction and the to-convict instructions:

> Ladies and gentlemen, there is [sic] a couple of instructions that I want to get to you very specifically because it could potentially be confusing. One of them is instruction number 6, we call it the Petrich instruction . . . .

RP (Oct. 30, 2013) at 331. The State followed these remarks by reading the entire Petrich instruction to the jury. After that, the prosecutor discussed the three to-convict instructions for each count. He told the jury that each count, as set forth in the to-convict instructions, involved sexual intercourse with K.K. that occurred "during the period of time intervening between September 15, 2011, and April 1, 2012, on a different occasion" in each count. RP (Oct. 30, 2013) at 331. The evidence is undisputed that during this period K.K.'s family and Johnson lived at the Brighton Street residence. And there is no dispute that the evidence shows "the counter" and "under the covers" incidents occurred at the Fir Street residence, not at the Brighton Street residence. The record plainly shows the prosecutor's closing remarks did not constitute an "election" of specific acts for purposes of the rule in Petrich.[8]

---

[8] Jury instruction 6 provided:
There are allegations that the defendant committed acts of rape of a child in the third degree against [K.K.] on multiple occasions. To convict the defendant on Count I, at least one specific act of rape of a child must be proved beyond a reasonable doubt and you must unanimously agree as to which act has been proved beyond a reasonable doubt. To convict the defendant on Count II, a different specific act of rape of a child must be proved beyond a reasonable

Defense counsel's closing remarks indicate he did not view the prosecutor's remarks as an election. He properly told the jury that they could consider only the acts that occurred during the charging period at the Brighton Street residence in accordance with the charging documents and the to-convict instructions:

> The State has limited its charging documents and its to convict instructions to some very important dates . . . The dates are all the same for all three [counts] September 15, 2011, to April 1st, 2012.

RP (Oct. 30, 2013) at 344. He also told the jury that although K.K. testified about incidents that occurred at the Des Moines and Fir Street residences, the State did not charge "anything that happened at those . . . you are not to consider them for purposes of finding whether or not Anton committed those [charged] acts. The Brighton Street is where they lived at from September of 2011 to April of 2012." RP (Oct. 30, 2013) at 344. The State's rebuttal argument did not repeat its mistaken comments.

As noted above, the court's to-convict instructions and the Petrich instruction told the jury that in order to convict Johnson, they must unanimously agree beyond a reasonable doubt on one, but different, specific act of rape of a child for each count. Further, in order to convict Johnson, they must also unanimously agree that the State has met its burden to prove each of the essential elements beyond a reasonable doubt. Other instructions told the jury that "the law is contained in my instructions to you. You must disregard any remark, statement, or argument [by counsel] that is not supported

---

doubt and you must unanimously agree as to which act was proved beyond a reasonable doubt. To convict the defendant on Count III, another different specific act of rape of a child must be proved beyond a reasonable doubt and you must unanimously agree as to which act was proved beyond a reasonable doubt.
CP at 25.

by the evidence or the law in my instructions." CP at 19. The trial court also instructed the jury that "it is also your duty to accept the law from my instructions . . . You must apply the law from my instructions to the facts . . . and in this way decide the case." CP at 18.

Under the facts presented here and the court's jury instructions, there is no possibility that the jury impermissibly relied on prior uncharged acts when it rendered its guilty verdicts. Johnson's <u>Petrich</u> violation claim fails. For the reasons discussed above, we are not persuaded that Johnson's right to a fair trial was violated.

<u>Notice</u>

Johnson also argues that the State violated his constitutional right to notice by presenting evidence of acts not charged in the information and electing those acts during closing argument to the jury. Because the jury instructions aligned with the charging document, we conclude Johnson had sufficient notice of the crimes charged.

"In Washington, a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed." <u>State v. Kitchen</u>, 110 Wn.2d 403, 409, 756 P.2d 105 (1988) (abrogated by <u>In re Stockwell</u>, 179 Wn.2d 588, 316 P.3d 1007 (2014)). "An accused person has a constitutional right to be informed of the charge he is to meet at trial and cannot be tried for a crime not charged." <u>State v. Jain</u>, 151 Wn. App. 117, 121, 210 P.3d 1061 (2009). In <u>Jain</u>, the State violated the defendant's right to notice by failing to provide adequate jury instructions:

> [N]o instruction asked the jury to unanimously decide which property's disposition made up the crime of money laundering. And the State does not argue that it made an election . . . [T]he jury in this case could have

-17-

returned a guilty verdict by finding that Jain committed acts not charged in the information, specifically acts relating to properties other than the [properties identified in the information].

Jain, 151 Wn. App. at 124.

Unlike in Jain, the trial court properly instructed the jury here. As discussed above, the jury instructions required the jury to unanimously agree on specific acts for each count charged within the charged period. The information charged Johnson with three counts of rape of a child in the third degree, and each count alleged the criminal act occurred "during a period of time intervening between September 15, 2011 through April 1, 2012 . . . ." CP at 1-2. The jury instructions properly mirrored the counts charged in the information. The instructions indicated that, to return a guilty verdict on each count, the jury needed to find that Johnson had sexual intercourse with K.K. "during the period of time between September 15, 2011 and April 1, 2012." CP at 26-28. The jury is presumed to follow the court's instructions on the law. Under the facts presented and jury instructions given here, Johnson was convicted solely of acts for which he was charged. No violation of his right to notice occurred.

### Ineffective Assistance of Counsel

Johnson argues that he was deprived of his constitutional right to effective assistance of counsel when his attorney failed to object to inadmissible hearsay, improper opinion on credibility and guilt, and unproved prior acts. He challenges the following evidence:

[K.K.'s mother]: So then, when I got off the phone [with K.K.'s grandmother] I asked, I brought her in my room and I asked her what was going on.

[STATE]: Asked who?

-18-

> [K.K.'s mother]: [T.K., K.K.'s sister,] asked her what was going on and she told me that [K.K.] told her that she wasn't really pregnant by [K.K.'s teenage boyfriend]. It was Anton's baby.
>
> . . .
>
> [STATE]: Did you ever, after [T.K.] told you that [K.K.] said it was Anton that she was pregnant by, did you ask [K.K.] whether or not that was true?
>
> [K.K.'s mother]: I did. After I talked to [T.K.] I brought [K.K.] into the room and I asked her and said, yes, it was true.

RP (Oct. 29, 2013) at 126.

> [T.K.]: Like, I could hear them [Johnson and K.K.], but they were like arguments like, "you got me pregnant." She used to have the argument just like—
>
> [STATE]: When did you learn that [K.K.'s boyfriend] was actually not the father of [K.K.]'s baby?
>
> [T.K.]: When she told me.
>
> . . .
>
> [STATE]: What did you tell [your mother]?
>
> [T.K.]: I said, "Anton hurt [K.K.]."
>
> [STATE]: Did you get any more specific than that?
>
> [T.K.]: I said, "the baby that she had, it was his."

RP (Oct. 29, 2013) at 152-53, 155.

> [STATE]: You asked [K.K.] at that point whether those things were true?
>
> [K.K.'s grandmother]: Yes.
>
> [STATE]: And she said, yes, they were?
>
> [K.K.'s grandmother]: Yes.

RP (Oct. 29, 2013) at 233.

Johnson also claims counsel failed to object to K.K.'s statement that she told both her sister and her mother that Johnson was the father of the baby.

-19-

Johnson asserts counsel failed to object to the following hearsay and opinion evidence:

> [K.K.'s grandmother]: The text [from K.K.'s mother] said, "ask your nigger how long he been sleeping with your granddaughter."
>
>     . . .
>
> [STATE]: Did you ever ask [K.K.] about it, whether it was true or not?
>
>     . . .
>
> [K.K.'s grandmother]: I asked her, I said, "well, you know, I wanted her to know that no matter—I support you." Because I love my grandchildren. They are my life. So I wanted her to know that I am not calling her to scold her or to, you know, talk bad to her. I just wanted to know the truth.
> I said, "did it happen?"
> She said, "yes."
>
>     . . .
>
> I said, "well, how long has this been going on?"
> She said, "for a while." So we just talked. I wanted her to know that I love her. I am not mad at her. I believe her.

RP (Oct. 29, 2013) at 208-09.

Johnson also contends defense counsel improperly opened the door to extensive hearsay and ER 404(b) evidence during Officer Eric Beseler's testimony. On direct examination, the officer mentioned he interviewed K.K.'s mother and T.K. During cross-examination, defense counsel questioned the officer regarding what T.K. said in this interview. On re-direct, the prosecutor asked the officer to recount everything T.K. had told him:

> [T.K.] explained when she and her sister were at the basketball court, the talk turned to older men being interested in them.
> [K.K.] confided slowly that Anton [Johnson] had showed an interest in her sexually. By the time that they returned home, [K.K.] was braiding [T.K.'s] hair and [K.K.] had said to have divulged that she had begun having sex with Anton [Johnson] when she was 11 years old. The first time was said to have occurred in the back room while other family members slept after Anton [Johnson] told her that he found her attractive saying that she was quote beautiful unquote and quote had a nice booty. [T.K.] stated that [K.K.] further stated that they continued to have sex on multiple other occasions.

-20-

RP (Oct. 29, 2013) at 181-82.

<u>Standard of Review</u>

This court reviews claims for ineffective assistance of counsel de novo. <u>State v. Sutherby</u>, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). "To prevail on a claim of ineffective assistance of counsel, counsel's representation must have been deficient, and the deficient representation must have prejudiced the defendant." <u>State v. Aho</u>, 137 Wn.2d 736, 745, 975 P.2d 512 (1999); <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "To establish ineffective representation, the defendant must show that counsel's performance fell below an objective standard of reasonableness. To establish prejudice, a defendant must show that but for counsel's performance, the result would have been different." <u>State v. McNeal</u>, 145 Wn.2d 352, 362, 37 P.3d 280 (2002) (citation omitted). Failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim. <u>Strickland</u>, 466 U.S. at 700.

<u>Deficient Performance</u>

Johnson failed to show that his counsel's performance was deficient. He has not shown that any objection would likely have been sustained, nor has he overcome the strong presumption that the decision not to object was a reasonable tactical decision.

We are reluctant to find ineffective assistance of counsel except in the most extreme cases. "[S]crutiny of counsel's performance is highly deferential and courts will indulge in a strong presumption of reasonableness." <u>State v. Thomas</u>, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). This is particularly true where, as here, the alleged deficient performance consists of an attorney's failure to object. "The decision of when or

-21-

whether to object is a classic example of trial tactics. Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). Further, "[w]here a claim of ineffective assistance of counsel rests on trial counsel's failure to object, a defendant must show that an objection would likely have been sustained." State v. Fortun-Cebada, 158 Wn. App. 158, 172, 241 P.3d 800 (2010).

Even if defense counsel had objected, proper grounds to admit the evidence existed, justifying its admission at trial. Not all out of court statements constitute hearsay. Hearsay is an out of court statement offered to prove the truth of the matter asserted, and is generally inadmissible except as provided in the rules of evidence. "In some cases, the courts have held that a statement is not hearsay if it is offered as 'background' (typically explaining why a person did or said something) or to supply a context for some other statement that is admissible. Usually these cases involve statements implicating the defendant in a criminal case, but offered for the limited purpose of explaining actions taken by police and others. In at least one case, the court admitted an out-of-court statement by a third person to supply context for a statement by the defendant." EVIDENCE LAW AND PRACTICE, 5B WASHINGTON PRACTICE § 801.13, 347-48; State v. Moses, 129 Wn. App. 718, 732, 119 P.3d 906 (2005) (Prosecution for murder. Victim told social worker about defendant's tendency toward violence in the home. The court held the victim's statements to social worker were not hearsay because they were not offered to prove the truth of the matter asserted. The statements were offered for nonhearsay purpose, to "show why [the social worker]

-22-

contacted CPS." Also, the court found no confrontation clause violation.). Here, the alleged hearsay statements fall under this well-settled rule and constitute nonhearsay statements offered to show why K.K.'s grandmother confronted Johnson and his subsequent admission of guilt to her and why Johnson called K.K.'s mother and his admission of guilt to her. Given Johnson's well developed "theme" at trial, discussed below, a reasonable jury would clearly understand that the alleged hearsay statements were offered solely to provide context for the defendant's statements to K.K.'s mother and grandmother. See State v. Demery, 144 Wn.2d 753, 762, 30 P.3d 1278 (2001) (no error in failing to give limiting instruction because the jury "clearly understood" that the third party's statements were offered solely to provide context for the defendant's statements.).[9] Johnson's deficient performance claim based on defense counsel's failure to object is not persuasive.

Even assuming counsel's failure to object constitutes deficient performance, the record demonstrates a reasonable tactical decision not to object. Throughout the trial from opening through closing remarks, counsel's defense strategy consisted of a well developed theme—K.K., T.K., and K.K.'s mother and grandmother intensely disliked Johnson and collaborated to oust him from the residence. Defense counsel stated in opening remarks: "Ladies and gentlemen of the jury, this is the case about the two sisters who got their way, when they got rid of Anton Johnson from their household." RP (Oct. 29, 2013) at 111. He reemphasized this theme in his closing argument:

---

[9] The State argues that some of the alleged hearsay statements are admissible as nonhearsay statements of identification under ER 801(d)(1). This assertion is questionable because the rule suggests a temporal requirement—a prompt identification after perceiving the person.

> In my opening statements, we talked about a theme that I thought would inform all of the evidence that you heard in this case. That is how this family the King family and the dislike of Anton Johnson and his role in that family started very early on, the strain of dislike runs through the testimony of [K.K.'s mother], [T.K.], [K.K.], and in the end, [K.K.'s grandmother].
>
> [K.K.'s mother], in her testimony, said that she did not want him there from the beginning.

RP (Oct. 30, 2013) at 336. Defense counsel argued that all of the witnesses used similar language, suggesting they had conspired:

> It is interesting that even the words that they chose on the witness stand and you saw them all testify together, there was no other witness in the room watching the testimony of the other family member, but they all just used that word, too. It is like a phraseology that seems to have developed over the last period of time since this happened and their testimony.
>
> Obviously, they have been talking about the blindly assumed thing as the story,[10] the family story to tell.

RP (Oct. 30, 2013) at 342-343. Defense counsel used the hearsay statements to advance the defense theory:

> [T.K.] hated Anton from earlier on. She said that he played sisters against each other. He would tell one she was pretty. Tell the other one something different. She said that he had said in this family many times and in public that she hated Anton from the beginning. She said even on one occasion she said that she wanted to kill him.
>
> Most tellingly, when [K.K.] told her what had happened to her, when [K.K.] told her, we would submit, that the untruth that Anton did this, she said, "I am going to send you to where your momma is." That is when she called Anton on the phone . . . [K.K.'s grandmother] decided to cast her lot with her own immediate family . . . .

RP (Oct. 30, 2013) at 336-37. Defense counsel also challenged the family members' credibility by repeatedly referring to their testimony as "hearsay upon hearsay" and

---

[10] The "blindly assumed thing" to which defense counsel refers is the fact that K.K.'s sister, mother, and grandmother all initially assumed that the father of K.K.'s baby was her teenage boyfriend and none of them questioned whether it was someone else.

"double hearsay on hearsay." RP (Oct. 30, 2013) at 339-40; see State v. Soonalole, 99 Wn. App. 207, 216, 992 P.2d 541 (2000) (Counsel's performance was not deficient when counsel used alleged hearsay statements to undermine the victim's credibility). Defense counsel's decision not to object to alleged hearsay statements was a reasonable trial strategy given the facts in this case.

Prejudice

Even assuming deficient performance by defense counsel, Johnson cannot show a reasonable probability that, but for counsel's errors, the verdict would have been different.

When a claim of ineffective assistance of counsel is based on the failure to object, "[o]nly in egregious circumstances on testimony central to the State's case" will the failure to object constitute incompetence of counsel justifying reversal. Madison, 53 Wn. App. at 763. None of the statements Johnson points to were central to the State's case. The alleged hearsay consists only of the assertions that Johnson was having sex with and impregnated K.K. Other than K.K., none of the family members testified to any description of the sex acts. K.K. gave thorough, detailed testimony about the numerous sex acts, and two witnesses testified that Johnson confessed to committing those acts. The family members' alleged hearsay statements were merely cumulative of K.K.'s testimony. In State v. Owens, 128 Wn.2d 908, 913 P.2d 366 (1996), a child molestation case, the admission of erroneous hearsay statements made by the victim to family members was harmless because "B.K. testified about the rapes at trial . . . The hearsay at issue consists only of the assertion that Owens molested B.K. Neither B.K.'s mother

-25-

nor his grandmother testified to any description of the molestation . . . The State also presented extensive medical evidence . . . ." Owens, 128 Wn.2d at 914.

Under the circumstances presented here, Johnson cannot show prejudice. The alleged hearsay could not have affected the verdict. See Owens, 128 Wn.2d at 914 ("Under these circumstances, admission of B.K.'s [hearsay] statements to his mother and grandmother could not have affected the verdict."). Because Johnson establishes neither deficient performance nor prejudice, his ineffective assistance claim fails.

Opinion on Credibility and Guilt

Johnson argues a comment by K.K.'s grandmother that she believed K.K.'s story constitutes an impermissible opinion on credibility and guilt.

In the context of the entire conversation between K.K. and her grandmother, it is evident that a reasonable jury would consider the comment as nothing more than words of reassurance and comfort rather than an impermissible opinion on credibility and guilt. This isolated, benign comment could not have affected the verdict in this case.

Unproved Prior Acts

Johnson also argues that his attorney improperly opened the door to K.K.'s testimony, discussed above, that sex with Johnson began when she was 11-years-old. He claims his attorney's cross-examination of Officer Beseler about his interview with T.K. opened the door to the prosecutor's redirect examination of Officer Beseler who testified that T.K. told him that K.K. said "she had began having sex with [Johnson] when she was 11 years old." RP (Oct. 29, 2013) at 182.

But Johnson does not establish that counsel's cross-examination of Officer Beseler about T.K.'s statements to him constitutes ineffective assistance of counsel.

The scope of cross-examination is generally a matter of judgment and strategy. <u>State v. Johnston</u>, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). We do not rest an ineffective assistance of counsel claim upon cross-examination strategy in the absence of specific reasons how such strategy is sufficient to undermine confidence in Johnson's conviction. <u>See</u> <u>State v. Thomas</u>, 109 Wn.2d 222, 225–26, 743 P.2d 816 (1987) (citing <u>Strickland</u>, 466 U.S. at 694).

The record shows that defense counsel asked the officer about "one statement" in his report—K.K. and T.K's "sharing secrets about older men" and "talking about older men being interested in them at the basketball court." RP (Oct. 29, 2013) at 181. It is questionable whether this single inquiry "opened the door" to K.K.'s comment about sex with Johnson beginning at age 11.

Indeed, what the record actually shows is the prosecutor's assumption that counsel's limited questioning allowed him to ask the officer to read T.K.'s complete statement to the jury from his report.[11] Johnson did not object at trial when the prosecutor asked Officer Beseler to read from his report and he assigned no error to the decision not to object.

Further, defense counsel's narrowly drawn cross-examination of Officer Beseler was strategically aimed at undermining T.K. and K.K.'s credibility by showing that T.K. and K.K. shared "secrets" and tried to "top each others' stories" with "something more outrageous than you," an overarching theme he developed throughout the trial. RP (Oct. 30, 2013) at 346.

---

[11] The prosecutor stated "I guess we can go through what T.K. said, then." RP (Oct. 29, 2013) at 181.

Johnson establishes neither deficient performance nor prejudice.[12]

Sentence for Community Custody

Johnson argues the court erred when it imposed community custody in addition to the statutory maximum term of confinement. Initially, the State conceded the sentence was improper and agreed with Johnson that the case should be remanded to the trial court only for the purpose of amending the sentence. But while Johnson's appeal was pending, our Supreme Court decided State v. Bruch, in which it held that trial courts may impose variable terms of community custody such that a defendant's total confinement does not exceed the statutory maximum. Bruch controls here, and we need not remand for resentencing.

In Bruch, the defendant claimed that his sentence was indeterminate because "the trial court added a term of community custody for the entire period of early release." Bruch, 182 Wn.2d at 862 (internal quotations omitted). The court rejected this argument: "A sentence is not indeterminate just because an offender may earn early release credits . . . Thus, trial courts still necessarily impose variable community custody periods in the sense that terms of confinement may later be shortened . . . ." Bruch, 182 Wn.2d at 862-863.

As in Bruch, the trial court here ordered a variable term of community custody not to exceed the statutory maximum: "[Community custody] is ordered for any period of time the defendant is released from total confinement before the expiration of the

---

[12] Johnson cites a civil case, Saks v. Hi-Tech Erectors, 168 Wn.2d 664, 230 P.3d 583 (2010). That case involved unfair prejudicial evidence—a party's immigration status.

maximum sentence." CP at 37.[13] Johnson argues that a trial court may not "impose a variable term depending on the length of earned early release." Br. of Appellant at 25. But, as in Bruch, Johnson's variable term of community custody does not exceed the statutory maximum. It merely requires that, if Johnson is released early, he is transferred to community custody for the remaining amount of time available in the statutory maximum sentence. Bruch's sentence operated in the same way, and the court rejected his argument that the variable community custody term was improper. Bruch, 182 Wn.2d. at 862-863. We conclude the trial court's sentence here was proper.

## CONCLUSION

For the reasons discussed above, Johnson failed to establish that the State violated his constitutional rights to sufficient evidence, jury unanimity, notice, and a fair trial. Johnson also failed to establish ineffective assistance by trial counsel and any error in sentencing. We affirm his convictions for three counts of third degree rape of a child.

WE CONCUR:

---

[13] In Bruch, the statutory maximum sentence was 120 months, and the trial court imposed a sentence of 116 months of confinement and ordered community custody for a period of "at least 4 months, plus all accrued earned early release time at the time of release." Bruch, 182 Wn.2d at 859.