# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 68662-3-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| DANIEL ALEXANDER THREADGILL, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SYNAE ARAYA MCMILLON-COOPER | ) | |
| AKA ARAYA MCMILLON, | ) | |
| | ) | |
| Defendant. | ) | FILED: July 11, 2016 |

TRICKEY, J. — Daniel Threadgill appeals his judgment and sentence for his conviction of first-degree murder. He contends that the trial court violated his right to a speedy trial, the State violated his constitutional rights by presenting evidence that he did not consent to a search of his cell phone, he received ineffective assistance of counsel, WPIC 4.01[1] is constitutionally defective, and the sentencing court failed to file the mandatory written findings of fact and conclusions of law in support of his exceptional sentence. We reject all arguments and affirm.

## FACTS

On August 31, 2010, police officers conducted a welfare check at a triplex apartment building in Des Moines, Washington. Neighbors had called 911 after becoming concerned about sounds coming from the center apartment. Upon

---

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 85 (3d ed. 2008) (WPIC).

arrival, the officers discovered the body of Jennifer Walstrand in a large pool of blood just inside the door to her apartment.

Walstrand had been stabbed 65 times. She had scrapes on her face, bruises on her arms and legs, a fractured jaw, and wounds on her head consistent with blunt force trauma. Blood spatter evidence established that there had been "a lot of violence and movement" and that Walstrand was upright and fighting for a portion of the attack.[2] None of Walstrand's wounds caused immediate death.

At the time of her death, Walstrand was working as a prostitute for a pimp named Calvin Davis. Walstrand had known Davis for over 10 years. Davis considered himself closer to Walstrand than any of the other women that worked for him. As his longest serving prostitute, Walstrand had many responsibilities.

Walstrand's next door neighbor, Araya McMillon-Cooper, also worked as a prostitute for Davis. Davis had arranged McMillon-Cooper's move into the triplex. Walstrand had a key to McMillon-Cooper's apartment and occasionally collected money from her on Davis's behalf. Walstrand also reported McMillon-Cooper's activities to Davis.

McMillon-Cooper had been living in the triplex since around June 2010. Shortly after she moved in, McMillon-Cooper met Threadgill, who worked in club promotions. McMillon-Cooper began working as a club promoter for Threadgill in addition to prostituting for Davis. During the next few months, McMillon-Cooper and Threadgill developed a close friendship and started socializing outside of work. Threadgill frequently spent time at the triplex. On occasion, he stayed overnight.

---

[2] Report of Proceedings (RP) (Jan. 10, 2012) at 175.

In late August 2010, Threadgill and McMillon-Cooper's relationship became sexual.

During that same period of time, McMillon-Cooper had a falling out with Davis. In late July 2010, McMillon-Cooper stopped turning money over to Davis because she needed it for her grandmother's funeral. In mid-August, Davis confronted McMillon-Cooper at the triplex. After she refused to give him money, Davis punched her in the mouth and kicked her. After this incident, and shortly before Walstrand's murder, McMillon-Cooper told Threadgill that she was a prostitute and that Davis had assaulted her. She also told him that she could not go back to the triplex because Walstrand would tell Davis and she would get beat up again. Threadgill assured her that no one would hurt her.

As part of their investigation into Walstrand's murder, detectives spoke with Davis, McMillon-Cooper, and Threadgill. Threadgill was not a suspect at the time. Detectives also submitted evidence to the Washington State Patrol Crime Laboratory for testing. The crime laboratory conducted extensive DNA (deoxyribonucleic acid) testing. Some of the evidence, including swabs from Walstrand's neck, revealed partial male DNA profiles. Walstrand's homicide went unsolved for approximately nine months.

In May 2011, Crime Stoppers of Puget Sound got a break in the case when they received an anonymous tip. The tip led police to Marian Kerow and Fardosa Mohamed. Kerow worked as a club promoter for Threadgill. She introduced Mohamed to Threadgill, and the three of them socialized together, often with McMillon-Cooper.

Detectives questioned Mohamed and Kerow individually in June 2011. Mohamed initially denied any knowledge of the murder but later admitted that she was present when Walstrand died. Kerow also admitted that she was present and had witnessed Walstrand's murder. Following these interviews, police began to focus their investigation on McMillon-Cooper and Threadgill. Kerow and Mohamed participated in the investigation by wearing wires and recording conversations with McMillon-Cooper and Threadgill.

On June 24, 2011, the State charged McMillon-Cooper and Threadgill with first-degree murder for the death of Walstrand. The charge included a deadly weapon sentencing enhancement.

On August 2, 2011, the State obtained an order authorizing law enforcement to collect a sample of Threadgill's DNA. The State collected Threadgill's DNA on August 18, 2011.

At the case setting hearing on September 14, 2011, Threadgill indicated that he wished to exercise his right to a speedy trial, which expired on November 12, 2011. The court scheduled the trial to begin on November 7, 2011.

The parties appeared in court again on September 23, 2011, when Threadgill moved to sever his case from McMillon-Cooper's. The State did not oppose this motion, which the trial court granted. McMillon-Cooper ultimately pleaded guilty to conspiracy to commit second-degree murder. During this hearing, Threadgill reiterated that he wanted to exercise his right to a speedy trial and try the case on November 7.

On October 17, 2011, the parties learned that Threadgill was excluded as

a contributor to the DNA found on Walstrand's body.

At the omnibus hearing on November 1, 2011, the State informed the court that it had submitted additional DNA samples to the crime laboratory for testing. In particular, it had submitted samples from Davis, McMillon-Cooper, and one of Walstrand's customers. The State indicated that it did not know whether the results would be available before the trial date of November 7. Nonetheless, the State indicated that it was prepared to go forward without the results. Threadgill again indicated that he was prepared to go to trial on November 7.

On November 2, 2011, Threadgill filed his trial brief. The next day, he filed a motion to admit other suspect evidence, where he sought to admit evidence of Davis's prior violent acts. In these materials, Threadgill indicated that he planned to argue that Davis killed Walstrand.

On November 4, 2011, the State moved to continue the trial. It stated that it was "unwilling to proceed to trial" without the results from the crime laboratory comparing Davis's DNA to the unknown male DNA from the crime scene.[3] Because the comparison would not be complete until the end of November, the State asked for a continuance until December 1, 2011. Threadgill opposed the continuance. He argued that the State's failure to obtain available evidence showed a lack of due diligence and was not a good cause for a continuance.

The court held a hearing on the State's continuance motion on November 7, 2011. Over Threadgill's objection, the trial court granted the motion and continued the trial until December 1, 2011. Prior to trial, the State amended the

---

[3] Clerk's Papers (CP) at 778.

charge against Threadgill to add an aggravating factor of deliberate cruelty.

At trial, the State relied primarily on eyewitness testimony. McMillon-Cooper, Mohamed, and Kerow all testified that they were present on the night of the murder. They described in great detail how Threadgill killed Walstrand. They testified that they watched Threadgill stab Walstrand repeatedly and stomp on her head as she begged for her life. McMillon-Cooper testified that Threadgill told her that he killed Walstrand because "[i]t was either [you] or her."[4]

The State also presented testimony from a forensic examiner who searched cell phones belonging to Threadgill, McMillon-Cooper, and Davis. During his testimony, the forensic examiner stated that he searched Threadgill's and McMillon-Cooper's cell phones pursuant to a court order and that he searched Davis's cell phone pursuant to his consent.

In general, the State argued that jurors should approach the case as an eyewitness case rather than a DNA case. It argued that Threadgill stabbed and stomped on Walstrand because he was "fed up" with the way McMillon-Cooper was being treated by Walstrand and Davis.[5]

Threadgill maintained his innocence. He argued that McMillon-Cooper, Mohamed, and Kerow were all lying. He focused on the fact that his DNA was absent from the crime scene and that unidentified male DNA was found on Walstrand's body.

A jury convicted Threadgill as charged. The trial court imposed an exceptional sentence based on the jury's finding of deliberate cruelty.

---

[4] RP (Feb. 1, 2012) at 16.
[5] RP (Feb. 2, 2012) at 3-4.

Threadgill appeals.

## ANALYSIS

### Criminal Rule (CrR) 3.3

Threadgill argues that the trial court violated his right to a speedy trial under CrR 3.3. Specifically, he contends that the trial court abused its discretion "[b]y continuing trial beyond the speedy trial deadline, over Threadgill's objection, and without sufficient justification."[6] We disagree.

"CrR 3.3 provides time limitations that must be observed for ensuring that criminal defendants are brought to trial in a timely manner." State v. Greenwood, 120 Wn.2d 585, 588-89, 845 P.2d 971 (1993). The purpose of this rule is "to protect the defendant's constitutional right to a speedy trial, and to prevent undue and oppressive incarceration prior to trial." State v. Kingen, 39 Wn. App. 124, 127, 692 P.2d 215 (1984). A criminal charge not brought to trial within the time limits of CrR 3.3 must be dismissed with prejudice. CrR 3.3(h); Greenwood, 120 Wn.2d at 591.

CrR 3.3(b)(1)(i) provides that an individual held in custody pending trial must be tried within 60 days of arraignment. Certain time periods are excluded from the computation of time, including continuances granted by the trial court. CrR 3.3(e)(3). CrR 3.3(f)(2) provides a basis by which a trial court may validly continue the start of trial:

> On motion of the court or a party, the court may continue the trial date to a specified date when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense. The motion must be made before the time for trial has expired. The court must state on the

---

[6] Br. of Appellant at 22.

record or in writing the reasons for the continuance.

If a continuance is properly granted, the time for trial will not expire until 30 days after the new trial date. CrR 3.3(b)(5).

"'[I]n exercising its discretion to grant or deny a continuance, the trial court is to consider all relevant factors.'" State v. Flinn, 154 Wn.2d 193, 199-200, 110 P.3d 748 (2005) (quoting State v. Heredia-Juarez, 119 Wn. App. 150, 155, 79 P.3d 987 (2003)). These factors include "surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure." State v. Downing, 151 Wn.2d 265, 273, 87 P.3d 1169 (2004).

A trial court may properly grant a continuance to permit the State time to obtain evidence. State v. Cauthron, 120 Wn.2d 879, 910, 846 P.2d 502 (1993). For example, in Cauthron, the Supreme Court held that Cauthron's right to a speedy trial was not violated where "the continuances were necessary to obtain the required evidence" and where Cauthron was not prejudiced by the delay in starting trial. 120 Wn.2d at 910.

A trial court may also properly grant a continuance to allow counsel time to prepare for trial. Flinn, 154 Wn.2d at 200-01. For example, in Flinn, the Supreme Court concluded that the trial court did not abuse its discretion in granting a continuance to allow the State to prepare for Flinn's diminished capacity defense. 154 Wn.2d at 196.

This court reviews an alleged violation of the speedy trial rule de novo. State v. Kenyon, 167 Wn.2d 130, 135, 216 P.3d 1024 (2009). But the decision to grant a continuance rests in the sound discretion of the trial court. Kenyon, 167

Wn.2d at 135. This court will not disturb the trial court's decision unless there is a clear showing that it is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. Kenyon, 167 Wn.2d at 135.

Here, the trial court did not abuse its discretion when it granted the State's request for a continuance. The trial court concluded that the continuance was required in the administration of justice. In reaching this conclusion, the trial court relied on the fact that the taking of [Davis's] DNA sample "could not have reasonably occurred earlier."[7] It also relied on the fact that the test results would not be complete until the end of November and that it was "necessary for the [S]tate to have the results" to respond to Threadgill's defense that Davis committed the murder.[8]

The trial court properly relied on these factors. As stated earlier, a trial court may grant a continuance to permit the State time to obtain evidence. Cauthron, 120 Wn.2d at 910. It may also grant a continuance to allow counsel time to prepare for trial. Flinn, 154 Wn.2d at 200. Both of those considerations are present here.

Threadgill filed his trial brief on November 2, 2011, and he moved to admit other suspect evidence on November 3, 2011. These materials made it clear that Threadgill planned to argue that Davis was another suspect in the murder. The need for the DNA results greatly increased at that time, as the results were crucial to rebut this theory. Because the results of Davis's DNA comparison would not be complete until the end of November, a continuance was proper to allow the State to obtain that evidence and to prepare for Threadgill's defense.

---

[7] RP (Nov. 7, 2011) at 20.
[8] RP (Nov. 7, 2011) at 21; CP at 787.

9

Moreover, Threadgill did not argue to the trial court that he would be prejudiced if the court granted the State's motion to continue. And he makes no argument on appeal that the continuance of a few weeks caused him any prejudice to the presentation of his defense. In short, under these circumstances, Threadgill has failed to show that the trial court's decision was based on untenable grounds or was for untenable reasons.

Threadgill asserts that "the State did not act with due diligence when it failed to timely request a DNA sample from Davis at any time between August 2010 and October 2011 and failed to submit it for comparison to evidence at the scene."[9] He relies on a declaration from Davis's attorney that states that prosecutors never asked Davis for a DNA sample prior to October 28, 2011, and that he would have advised Davis to provide a sample. Threadgill further asserts that "where the State fails to exercise due diligence in obtaining evidence, it cannot rely on the absence of that evidence as valid grounds for a continuance."[10]

But the trial court found that the State acted diligently in this case. Specifically, it found that "the taking of [Davis's] DNA sample could not have reasonably occurred earlier."[11] And this finding is supported by substantial evidence in the record.

In a declaration, the prosecutor explained that in March 2010, Davis was charged in an unrelated case. In April 2011, Davis was convicted of all charges. Davis subsequently moved for a new trial and that motion was pending when the

---

[9] Br. of Appellant at 26.
[10] Br. of Appellant at 23.
[11] RP (Nov. 7, 2011) at 20.

State filed charges against Threadgill. The State approached Davis about assisting in the prosecution of Threadgill but, due to his pending motion for a new trial, Davis's counsel advised Davis not to assist the State. Davis withdrew his motion for a new trial on October 13, 2011, pursuant to an agreement with the State, and the court sentenced Davis on October 19, 2011. After sentencing was completed, Davis's counsel agreed to allow Davis to cooperate in Threadgill's case. The State interviewed Davis on October 28, 2011, and obtained a DNA sample at that time.

These facts support the trial court's determination that the taking of Davis's DNA sample could not have reasonably occurred earlier. Based on Davis's earlier representation that he would not assist in the prosecution of Threadgill, it is reasonable to believe that a request for a DNA sample would not have been fruitful. Under these circumstances, the fact that the State did not explicitly ask Davis for a DNA sample prior to October 28, 2011, does not show a lack of diligence.

### Forensic Examiner's Testimony

Threadgill next argues that the State violated his constitutional rights under the Fourth Amendment and article I, section 7 of the Washington Constitution by presenting evidence that he did not consent to a search of his cell phone. Threadgill contends that the use of this evidence improperly penalized the lawful exercise of a constitutional right. Because Threadgill fails to show manifest constitutional error, he is precluded from raising this claim for the first time on appeal.

To raise an error for the first time on appeal, an appellant must demonstrate

(1) the error is "truly of a constitutional magnitude" and (2) the error is manifest. State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). "[M]anifest" requires a showing of actual prejudice. Kalebaugh, 183 Wn.2d at 584. "'To demonstrate actual prejudice, there must be a plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" Kalebaugh, 183 Wn.2d at 584 (alteration in original) (internal quotation marks omitted) (quoting State v. O'Hara, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)).

In State v. Gauthier, this court held that the prosecutor's use of Gauthier's invocation of his constitutional right to refuse consent to a warrantless search as substantive evidence of guilt was manifest constitutional error. 174 Wn. App. 257, 267, 298 P.3d 126 (2013), review denied, 185 Wn.2d 1010, 368 P.3d 171 (2016). There, Gauthier was suspected of rape and declined to provide a DNA sample to compare with evidence found on the victim. 174 Wn. App. at 261. At trial, the prosecutor repeatedly questioned Gauthier during cross-examination about his refusal to provide a DNA sample, elicited the testimony "for the primary purpose of encouraging the jury to infer guilt based on Gauthier's refusal to provide a DNA sample," and argued that Gauthier's refusal was consistent with the actions of a guilty person. 174 Wn. App. at 262, 270.

Threadgill relies on Gauthier to argue that the "same violation occurred at [his] trial"[12] when the State elicited the following testimony from a forensic examiner:

> [Prosecutor]: Specifically, how many phones did you review with respect to Ms. Araya McMillon-Cooper?

---

[12] Br. of Appellant at 28.

[Forensic Examiner]: Two, an LG and a Samsung.

[Prosecutor]: And did you review a phone that purported to belong to Daniel Threadgill?

[Forensic Examiner]: Yes, a Sanyo.

[Prosecutor]: All right. And one purporting to belong to Calvin Davis?

[Forensic Examiner]: Yes, Blackberry.

[Prosecutor]: Now, in reviewing the phone records or the phones for Ms. McMillon-Cooper and Mr. Threadgill, was that pursuant to a court order?

[Forensic Examiner]: Yes.

[Prosecutor]: What about the records or the phone for Mr. Davis?

[Forensic Examiner]: It was on consent.

[Prosecutor]: On Mr. Davis' consent?

[Forensic Examiner]: Correct.[13]

Threadgill asserts, "As in Gauthier, at Threadgill's trial the prosecutor elicited his lack of cooperation (the necessity of a court order to obtain his phone records) and contrasted that exercise of his constitutional right to refuse a warrantless search with the cooperation of another individual once suspected of involvement in the crime (Davis'[s] consent)."[14]

But Threadgill fails to show that this testimony amounts to a manifest constitutional error under RAP 2.5(a). In contrast to Gauthier, the prosecutor did not use Threadgill's invocation of his constitutional right to refuse consent to a search of his cell phone as substantive evidence of guilt. Nor did the prosecution

---

[13] RP (Jan. 31, 2012) at 29-30.
[14] Br. of Appellant at 29.

question Threadgill about his lack of consent or argue that Threadgill's actions were consistent with a guilty person. Simply put, the forensic examiner's testimony was a fleeting reference to Threadgill's exercise of a constitutional right. It does not rise to the level of manifest constitutional error.

### Ineffective Assistance of Counsel

Threadgill argues in the alternative that his trial counsel's failure to object to the forensic examiner's testimony deprived him of his constitutional right to effective assistance of counsel. We disagree.

To establish an ineffective assistance of counsel claim, a defendant must show both deficient performance and resulting prejudice. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If a defendant cannot demonstrate either prong, the ineffective assistance of counsel claim fails. State v. Foster, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

Counsel's performance is deficient if it falls "below an objective standard of reasonableness." McFarland, 127 Wn.2d at 334. To establish deficient performance, the defendant must show the absence of any "conceivable legitimate tactic" supporting counsel's action. State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

"The decision of when or whether to object is a classic example of trial tactics." State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." Madison, 53 Wn. App. at 763.

14

To establish prejudice, the defendant must show there is a reasonable probability that, but for the deficient performance, the outcome would have been different. McFarland, 127 Wn.2d at 335. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Here, Threadgill fails to show that he received ineffective assistance of counsel. First, he fails to show that the decision not to object was not a legitimate trial tactic. Second, even if the failure to object constituted deficient performance, Threadgill fails to show prejudice. This testimony was not central to the State's case. It was merely a fleeting reference to Threadgill's assertion of a constitutional right. Moreover, the evidence of guilt was overwhelming. In short, there is not a reasonable probability that the outcome of the trial would have been different.

## Reasonable Doubt Instruction

Threadgill argues that the reasonable doubt jury instruction that was used at his trial is constitutionally defective. He contends that the instruction improperly adds an articulation requirement and impermissibly undermines the presumption of innocence. He further contends that the use of this instruction requires reversal. We reject this claim.

The trial court gave a reasonable doubt jury instruction that was identical to WPIC 4.01—the standard reasonable doubt instruction. In relevant part, that instruction states: "A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence."[15]

---

[15] CP at 670.

In State v. Bennett, our Supreme Court directed trial courts to use WPIC 4.01 in all criminal cases. 161 Wn.2d 303, 318, 165 P.3d 1241 (2007). More recently, in Kalebaugh, the Supreme Court reaffirmed that WPIC 4.01 was the "proper" instruction and "the correct legal instruction on reasonable doubt." 183 Wn.2d at 585-86. This court recently noted the Supreme Court's directive and upheld the use of WPIC 4.01 in State v. Lizarraga, 191 Wn. App. 530, 567, 364 P.3d 810 (2015), review denied, 185 Wn.2d 1022, 369 P.3d 501 (2016). Because controlling case authority directs the use of this standard instruction, we reject Threadgill's claim.

## Sentencing

Finally, Threadgill argues the sentencing court erred when it failed to enter written findings of fact and conclusions of law supporting his exceptional sentence. He asserts that a remand is necessary. We disagree.

"Whenever a sentence outside the standard range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law." RCW 9.94A.535.

Here, the judgment and sentence contains the necessary written findings of fact and conclusions of law. Section 2.5 of the judgment and sentence contains preprinted findings of fact and conclusions of law, which the trial court completed. Section 2.5 states:

> Finding of Fact: The jury found or the defendant stipulated to aggravating circumstances as to Count(s)__I__.
>
> Conclusion of Law: These aggravating circumstances constitute substantial and compelling reasons that justify a sentence above the

standard range for Count(s)_I_.[16]

In section 2.1(j) of the judgment and sentence, the trial court identified the relevant aggravating circumstance as deliberate cruelty.

Threadgill does not argue that these written findings of fact and conclusions of law are insufficient. Instead, he appears to argue that the findings of fact and conclusions of law must be contained in a separate document and that the trial court may not rely on the preprinted language in the judgment and sentence to meet its statutory requirement. But Threadgill cites no authority to support this position. In the absence of such authority, we may presume that counsel found none. Roberts v. Atlantic Richfield Co., 88 Wn.2d 887, 895, 568 P.2d 764 (1977). Accordingly, we reject this claim.

We affirm the judgment and sentence.

Trickey, ACJ

WE CONCUR:

_____                    Cox, J.

---

[16] CP at 756.